ANGELO BROADCASTING, INC., d/b/a/ Radio Stations KTEO–AM & KTEO–FM, O.P. Bobbitt, and Philip Bobbitt, Appellants,

v.

SATELLITE MUSIC NETWORK, INC., d/b/a/ Satellite Music Network, Appellee.

No. 05–91–00451–CV.

Court of Appeals of Texas, Dallas.

July 22, 1992.

Rehearing Denied Sept. 9, 1992.

R. James George, Jr., Eric G. Behrens, Austin, for appellants.

Dan S. Boyd, Lewis T. LeClair, Stephen Cormac Carlin, Dallas, for appellee.

Before THOMAS, KINKEADE and ROSENBERG, JJ.

## OPINION

KINKEADE, Justice.

Angelo Broadcasting, Inc., d/b/a/ Radio Stations KTEO–AM & KTEO–FM, O.P. Bobbitt, and Philip Bobbitt (collectively Angelo) appeal the portion of the trial court's judgment rendered in favor of Satellite Music Network, Inc., d/b/a Satellite Music Network (SMN). SMN cross-appeals the portion of the trial court's judgment rendered in favor of Angelo. In four points of error, Angelo argues that the trial court erred in (1) awarding SMN recovery for unjust enrichment, (2) granting SMN a judgment notwithstanding the verdict on Angelo's fraud claim, and (3) awarding SMN attorneys' fees. In fourteen cross-points, SMN argues that the trial court erred in (1) realigning the parties, (2) awarding Angelo damages pursuant to the Deceptive Trade Practices Act (DTPA), (3) permitting Angelo to amend its pleadings the morning of trial without granting SMN a continuance to conduct additional discovery, and (4) submitting jury questions three and five. Because the trial court erred in awarding SMN recovery for unjust enrichment and in awarding SMN its attorneys' fees, we reverse and render a take-nothing judgment in Angelo's favor on SMN's claim for the fees. Because Angelo failed to give the requisite DTPA notice and because the trial court erred in abating the case post-trial and in allowing Angelo to file a post-trial amendment concerning notice, we reverse the trial court's award of DTPA damages to Angelo and instruct the trial court to abate this cause of action for sixty days to afford Angelo the opportunity to give the requisite notice. Because there is some evidence to support the jury's finding of fraud and evidence to support a "puffery" instruction to the jury, we reverse the trial court's judgment notwithstanding the verdict on Angelo's fraud claim and remand for further proceedings.

### FACTUAL AND PROCEDURAL HISTORY

In 1975, O.P. Bobbitt and a partner formed Angelo Broadcasting and bought an AM station, KTEO, in San Angelo, Texas, for $350,000. In 1976, Angelo Broadcasting bought an FM station, KWLW (now KTEO–FM), in the same city for $146,000. After Bobbitt's partner and wife both died in 1978, Bobbitt's son, Philip, acquired their share of the business. From 1975 to 1982, Angelo Broadcasting operated both KTEO–AM and KWLW–FM as

country and western music stations serving San Angelo and a limited surrounding area.

In 1981, a trend away from AM stations began. In 1982, Angelo Broadcasting's profits increased, but its ratings and gross receipts declined. In response, Angelo Broadcasting built a new, taller FM tower, purchased new studio equipment, and began thinking about changing its programming.

In 1981, John Tyler and a group of investors formed Satellite Music Network. The idea behind SMN was to transmit high-quality, around-the-clock, live, market-tested programming to radio stations via satellite. SMN provided three music formats—classic rock, adult contemporary, and country and western. Through the use of satellite programming, a station could reduce its personnel and equipment costs. SMN charged each affiliated radio station a monthly service fee. Additionally, each radio station gave SMN two minutes per hour of commercial time, which SMN then sold to national advertisers. Tyler announced SMN's new services at a broadcaster's convention in March 1981 and started an advertising campaign in *Broadcasting* magazine, the weekly trade journal. SMN went on the air on August 31, 1981, with three affiliates.

O.P. Bobbitt and Joe Rushing, Angelo Broadcasting's general manager at the time, read about SMN in several advertisements appearing in *Broadcasting* magazine in 1981 and 1982. Rushing contacted SMN to obtain additional information. During Fall 1982, SMN's representative, David Garrity, met with the Bobbitts and Rushing to discuss SMN's services. They discussed some ads that Garrity had brought to the meeting and changing the FM station's format from country and western to adult contemporary. Several days later, on November 10, 1982, Angelo entered into a two-year contract with SMN to provide its adult contemporary format for the FM station and its country and western format for the AM station beginning January 1983.

Angelo Broadcasting used SMN's services for most of the contract period. It used the country music format on the AM station for the entire two years, and it used the adult contemporary format on the FM station for eighteen months. During this time, the stations' ratings continued to fall. Beginning in May 1984, Angelo Broadcasting refused to pay the monthly service fee. The Bobbitts eventually sold the radio stations in 1988.

On February 11, 1985, SMN sued Angelo Broadcasting in Dallas for approximately $15,000 in past-due monthly license fees, alleging breach of contract or, alternatively, unjust enrichment. Later that same day, Angelo sued SMN in Austin alleging DTPA violations. SMN specifically excepted to Angelo's failure to give the required statutory DTPA notice and moved to transfer venue to Dallas. The Austin court ordered the transfer on June 22, 1987. On February 15, 1989, Angelo filed a counterclaim, and on February 22, 1989, the cases were consolidated. On March 20, 1990, Angelo moved to realign the parties. The Dallas court ordered the parties realigned on April 12, 1990. It designated Angelo as the plaintiff and SMN as the defendant. After realignment, Angelo pleaded DTPA violations, breach of contract, breach of the duty of good faith and fair dealing, and negligent misrepresentation. Alternatively, Angelo pleaded for rescission of the contracts either because of failure of consideration, fraud in the inducement, or negligent misrepresentation. SMN once again specifically excepted to Angelo's failure to give the required statutory DTPA notice and moved to abate the case. The court denied SMN's motion.

On August 22, 1990, thirteen days before trial, Angelo sought to amend its pleadings to assert the discovery rule as a defense to SMN's limitations defense to Angelo's DTPA claim. Six days later, a visiting judge overruled Angelo's motion. On the day before trial, Angelo asked the court to reconsider its motion. After reconsideration, the court granted Angelo's motion and permitted the "discovery rule" amendment. SMN then sought a continuance on the grounds that it was not prepared to try the discovery rule issue. The court denied the

request. Trial began on September 4, 1990. The jury returned a verdict in favor of Angelo on its DTPA and fraud claims and in favor of SMN on its unjust enrichment claim and Angelo's negligence claim, finding Angelo sixty percent negligent. In connection with the DTPA violation, the jury found that Angelo suffered damages in the amount of $200,000 for loss of the benefit of the bargain, $500,000 for damage to the radio stations' value, and $200,000 for out-of-pocket loss. The jury also found that SMN committed its false, misleading, or deceptive acts or practices knowingly and assessed additional damages of $1,000,000.

On November 20, 1990, SMN moved for a judgment notwithstanding the verdict for several reasons, including Angelo's failure to give SMN the requisite statutory DTPA notice. On November 26, 1990, the court abated the case to permit Angelo to give notice. The next day Angelo gave notice and made demand on SMN for $3.25 million, which represented recovery under the jury findings including fraud. In response, SMN offered to settle with Angelo for the actual damages found by the jury on its DTPA claim ($700,000) plus Angelo's attorneys' fees of $170,249. Angelo rejected the offer. Subsequently, the trial court reduced the judgment to reflect SMN's rejected settlement offer. On February 27, 1991, the trial court entered judgment for Angelo on its DTPA claim, awarding it $700,000 as actual damages, plus $1,000,000 as additional damages, and $2000 as statutory damages, plus $819,357.27 as prejudgment interest, and $170,249 as reasonable and necessary attorneys' fees. It also granted SMN judgment for unjust enrichment in the amount of $15,100, plus reasonable and necessary attorneys' fees in the amount of $109,000, and entered a judgment notwithstanding the verdict on Angelo's fraud claim.

### UNJUST ENRICHMENT

In its second and third points of error, Angelo contends that the trial court erred in awarding SMN recovery for unjust enrichment. Angelo argues that the parties' entry into written contracts bars recovery on the basis of the equitable doctrine of unjust enrichment. Angelo further argues that a party guilty of fraud may not recover for unjust enrichment. SMN argues that, because Angelo pleaded for rescission of the contracts under one of its causes of action, it cannot now argue that the contracts are enforceable.

■ Quantum meruit is founded on unjust enrichment. *Vortt Exploration v. Chevron U.S.A.*, 787 S.W.2d 942, 945 (Tex. 1990). Although the presence of a valid contract governing the rendered services may defeat a recovery in quantum meruit, the finding of an agreement does not defeat all restitution remedies grounded in the principle of unjust enrichment. *City of Harker Heights v. Sun Meadows Land, Ltd.*, 830 S.W.2d 313 (Tex.App.—Austin, n.w.h.); *see Truly v. Austin*, 744 S.W.2d 934, 936 (Tex.1988). Quantum meruit is allowed when a plaintiff has *partially* performed an express contract but, because of the defendant's breach, the plaintiff is prevented from completing the contract. *Truly*, 744 S.W.2d at 936; *Coon v. Schoeneman*, 476 S.W.2d 439, 441 (Tex.Civ.App.—Dallas 1972, writ ref'd n.r.e.). In this situation, a plaintiff may pursue both damages and restitution as remedies for breach of contract by alternative pleadings and make his election at trial. *Coon*, 476 S.W.2d at 441 (citing 5 ARTHUR LINTON CORBIN, CORBIN ON CONTRACTS § 1110, at 590 (1964)).

■ The remedy of restitution, however, is not available to one who has *fully* performed his part of the contract if the only part of the agreed exchange for the performance that the defendant has not rendered is a sum of money constituting a *liquidated debt*. A liquidated debt means a debt that is immediately and unconditionally due. BLACK'S LAW DICTIONARY 839 (5th ed. 1979). Full performance does not make restitution unavailable if any part of the consideration due from the defendant in return is something other than a liquidated debt. *Coon*, 476 S.W.2d at 441 (citing RESTATEMENT OF CONTRACTS § 350 (1932)). This limitation is reasonable because, if the plaintiff has obligated himself to perform

services for a certain amount, and he has already earned that amount, it is just to measure his compensation by the amount he agreed to take for such services. *Id.* (citing 5 CORBIN, §§ 1110, 1111).

█ Here, the record shows that:

(1) SMN fully performed under the contracts;

(2) Each contract provided that Angelo pay a $900 monthly service fee and that Angelo give SMN two minutes per hour of commercial time;

(3) The term of both contracts ran from January 1, 1983, through December 31, 1984;

(4) Angelo quit paying the monthly service fees under the contracts in May 1984;

(5) The jury found that Angelo always broadcasted the national advertising supplied by SMN; and

(6) The jury found that Angelo was unjustly enriched by SMN providing Angelo satellite programming and that $15,100 would reasonably compensate SMN.

From this evidence, we conclude that SMN fully performed under the contracts, that Angelo gave SMN the two minutes of commercial time due under the contracts, and that the only remaining debt Angelo owed under the contracts was liquidated. SMN pleaded alternatively for both damages and restitution in its breach-of-contract action. It chose to pursue restitution at trial. Once the jury found that Angelo broadcast all of the national advertising supplied by SMN, however, only liquidated damages remained, and SMN was precluded from recovering in quantum meruit for the value of the services rendered. *See Coon,* 476 S.W.2d at 441.

Because SMN had fully performed under the contracts and the only sum Angelo had not rendered was liquidated, the trial court erred in awarding SMN recovery for unjust enrichment. We sustain Angelo's second point of error. Because of our disposition of Angelo's second point of error, we need not address its third point of error concerning whether a party guilty of fraud can also recover for unjust enrichment.

## JUDGMENT NOTWITHSTANDING THE VERDICT

In its first point of error, Angelo contends that the trial court erred in awarding SMN a judgment notwithstanding the verdict on the jury's fraud award. Angelo argues that the evidence is sufficient to support the jury's finding that SMN committed fraud. SMN argues that (1) Angelo had no pleadings to support a fraud claim, (2) Angelo failed to prove proximate cause, (3) there is legally insufficient evidence of any actionable fraudulent misrepresentation as opposed to mere "puffery," (4) the trial court erred in failing to submit SMN's puffery instruction to the jury, (5) awarding Angelo both fraud and DTPA damages would have constituted an impermissible double recovery, and (6) the jury's finding that SMN committed fraud irreconcilably conflicts with its finding that Angelo was unjustly enriched.

After the jury returned its verdict, SMN moved for a judgment notwithstanding the verdict on Angelo's fraud claim. SMN raised all of the same arguments in its motion that it raises on appeal, except that it did not argue that Angelo failed to prove proximate cause. The court granted SMN's motion finding that there was insufficient evidence to support the jury's fraud finding.

### Standard of Review

█ A court may grant a motion for judgment notwithstanding the verdict when (1) a defect specifically identified in the nonmovant's pleading makes it insufficient to support a judgment, (2) the truth of fact propositions, under the substantive law, establishes the right of the movant, or (3) the evidence is insufficient to raise an issue as to one or more fact propositions that the nonmovant must establish for the court to render judgment in its favor. *Rowland v. City of Corpus Christi,* 620 S.W.2d 930, 932–33 (Tex.Civ.App.—Corpus Christi 1981, writ ref'd n.r.e.). The trial court may not disregard a jury's answer that has some support in the evidence even though the great weight and preponderance of the evi-

dence may be to the contrary. *Harris County v. McFerren*, 788 S.W.2d 76, 78 (Tex.App.—Houston [1st Dist.] 1990, writ denied). To sustain the action of the trial court in granting a motion for judgment notwithstanding the verdict, this Court must determine that there is no evidence upon which the jury could have made the findings relied upon. *Trenholm v. Ratcliff*, 646 S.W.2d 927, 931 (Tex.1983); *see* Tex.R.Civ.P. 301. We must consider all the evidence in the light most favorable to the nonmovant and indulge every reasonable inference deducible from the evidence in that party's favor. *Dowling v. NADW Mktg., Inc.*, 631 S.W.2d 726, 728 (Tex.1982).

■ When the trial court specifies its reason for granting a judgment notwithstanding the verdict, the appellant need only discredit that ground of the appellee's motion. *See Friedman v. Houston Sports Ass'n*, 731 S.W.2d 572, 573 (Tex.App.—Houston [1st Dist.] 1987, writ ref'd n.r.e.); *Monk v. Dallas Brake & Clutch Serv. Co.*, 697 S.W.2d 780, 783 (Tex.App.—Dallas 1985, writ ref'd n.r.e.). The only sufficiency argument raised by SMN's motion concerning Angelo's fraud claim was that there was no evidence of actionable misrepresentation as opposed to mere "puffery."

### Misrepresentation v. Puffery

■ Texas courts have defined "puffery" as an expression of a seller's opinion not made as a representation of fact. *Dowling v. NADW Mktg., Inc.*, 631 S.W.2d 726, 729 (Tex.1982); *Autohaus v. Aguilar*, 794 S.W.2d 459, 465 (Tex.App.—Dallas 1990), *denied per curiam*, 800 S.W.2d 853 (Tex.1991). Generally, pure expressions of opinion are not actionable. *Trenholm*, 646 S.W.2d at 930. Whether a statement constitutes harmless puffing or an actionable misrepresentation depends on the following factors:

(1) The statement's specificity. Imprecise or vague representations constitute mere opinions. *Autohaus*, 794 S.W.2d at 462;

(2) The speaker's knowledge. An opinion may constitute actionable fraud if the speaker has special knowledge of

its falsity. *Trenholm*, 646 S.W.2d at 930;

(3) The comparative levels of the buyer's and the seller's knowledge. The seller's superior knowledge, in conjunction with the buyer's relative ignorance, operates to make the slightest divergence from mere praise into representations of fact. *Autohaus*, 794 S.W.2d at 463; and

(4) Whether the statement relates to the present or the future. An expression of an opinion as to the happening of a future event may constitute actionable fraud where the speaker purports to have special knowledge of facts that will occur or exist in the future. *Trenholm*, 646 S.W.2d at 930; *Autohaus*, 794 S.W.2d at 464.

■ Considering only the evidence in support of the jury's fact finding and disregarding all contrary evidence, the record shows that:

(1) In 1982, satellite technology was a relatively new concept in the radio industry.

(2) The Bobbitts claimed that they were ignorant about this new technology.

(3) O.P. Bobbitt and Rushing initially learned about SMN through its ads in *Broadcasting* magazine. O.P. Bobbitt read all of SMN's ads. He, however, was reluctant to sign a contract with SMN based on the ads alone. What drew Rushing's attention to the ads were SMN's claims that it would increase ratings and lower costs.

(4) SMN published the following claims in some of its ads:

(a) March 15, 1982—"straight facts from people who offer you programming and profits instead of just promises.... [H]as over 125 affiliates ... and whose proven financial benefits for subscribers are as solid as the future of satellite broadcasting itself."

(b) May 10, 1982—"Today, Satellite Music Network has over 150 subscribers who are already benefitting from our StarStation and Country Coast-to-Coast formats, both financially and in the ratings book."

(c) July 12, 1982—"[W]e have more than 150 affiliates who have evidence on their bottom line."

(d) November 15, 1982—"200 affiliates whose fortunes continue to rise."

(5) SMN's internal reports showed that:

(a) As of May 21, 1982, SMN had only 68 on-air affiliates and a total of 129 stations under contract using or planning to use its StarStation and Country Coast-to-Coast format.

(b) As of July 7, 1982, SMN had only 84 on-air affiliates and a total of 131 stations under contract.

(c) As of January 24, 1983, SMN had only 153 on-air affiliates.

(6) Tyler admitted that stations that had just contracted with SMN would not have benefitted yet in the ratings book and that SMN did not have financial data on all of its affiliates.

(7) Some of these ads were distributed at the November 1982 meeting.

(8) At that meeting, the Bobbitts indicated that they needed reassurance that SMN's services would increase their radio stations' ratings and profits and that SMN would become dominant in the market place. When Philip Bobbitt stated that he feared that a remote broadcast would sound phony, Garrity told him that his fears were groundless and that SMN stations were succeeding. Garrity used as his main sales pitch the increased ratings at other stations.

(9) Garrity testified that he knew that the Bobbitts were looking for assurances that SMN would solve all their problems and that they were unsure in what direction their radio stations should be aimed. He also testified that he did everything possible to make them feel comfortable with their choice. He showed them "every bit of information and examples and literature that [SMN] had available." He further testified that "[i]f the advertising said that all the stations had benefit[t]ed from either increases in sales or ratings, if the advertising specifical-ly said that, then I would have supported it."

(10) Garrity never told the Bobbitts that SMN had about a twenty percent cancellation rate.

(11) The Bobbitts signed two contracts with SMN several days after the meeting.

From this evidence, a reasonable fact finder could infer that:

(1) The Bobbitts saw the March 15 and May 10 ads at the November 1982 meeting and based on these ads the Bobbitts' radio stations would benefit both financially and in the ratings book if they contracted with SMN.

(2) SMN and Garrity knew more than the Bobbitts about the new satellite technology and its capabilities.

(3) Based on its own internal reports, SMN knew that its ad claims were false.

(4) Garrity reiterated what SMN's ads stated and assured the Bobbitts that they would benefit financially and in the ratings book if they contracted with SMN.

From the above evidence and the resulting inferences, there was some evidence to support the jury's finding of actionable fraudulent misrepresentation.

### Jury Instruction

In its seventh cross-point concerning actionable misrepresentation under the DTPA and in response to Angelo's argument that the trial court erred in awarding SMN a judgment notwithstanding the verdict on the jury's fraud award, SMN argues that the trial court erred in failing to submit SMN's puffery instruction to the jury. Under the Texas Rules of Civil Procedure, the trial judge must give proper instructions and definitions to enable the jury to render a verdict. TEX.R.CIV.P. 277. An instruction is proper if it finds support in any evidence or the inferences drawn therefrom and if it might aid or assist the jury in answering the issues submitted. *Miller v. Miller,* 700 S.W.2d 941, 952 (Tex. App.—Dallas 1985, writ ref'd n.r.e.). The trial judge has wide discretion to determine

the sufficiency of definitions and instructions. At a minimum, the trial court must define those words and other technical phrases that have a distinct legal meaning. *Security Sav. Ass'n v. Clifton*, 755 S.W.2d 925, 933 (Tex.App.—Dallas 1988, no writ). The trial court should submit explanatory instructions when, in its sole discretion, it determines that the instructions will help the jury to understand the meaning and effect of the applicable law and presumptions. *Security Sav. Ass'n*, 755 S.W.2d at 933.

■■■ The trial court submitted the following issue to the jury:

> Did Satellite Music Network commit any acts of fraud proximately causing damages to Angelo Broadcasting?
>
> "Fraud" means a misrepresentation, if any, made to Angelo Broadcasting in connection with the sale of Satellite Music's services if (1) the representation was material, (2) it was false at the time it was made, (3) the defendant making the misrepresentation knew it was false at the time it was made, or was reckless about the truth of the matter asserted, (4) the statement was made with the intent that Angelo acted in reliance upon it and thereby suffered injury. "Fraud" can also be the successful employment of cunning, deception or artifice to circumvent, cheat or defraud another to his injury.

SMN requested that the trial court also submit the following instruction to the jury: " 'Puffery' is an expression of opinion by a seller not made as a representation of fact." The trial court denied SMN's request.

A review of all the evidence presented shows that:

(1) O.P. Bobbitt had forty-nine years' experience in the broadcast industry. Rushing had approximately twenty-five years in the industry. Philip Bobbitt was a law professor and managed the radio stations for several months.

(2) Garrity had no authority and could not make guarantees or assurances that SMN would increase Angelo's ratings because there are too many factors outside of SMN's control that affect ratings. His usual practice was to tell prospective affiliates that SMN would give them all the elements, but they still had to work to become dominant. He used SMN's ads only to show what other affiliates had accomplished.

(3) Rushing could not say that any specific statement that Garrity made was untrue.

(4) It takes more than programming for a station to dominate the market and the Bobbitts knew this.

(5) The ad copy was sent to the publishers several weeks prior to publication, and SMN anticipated having the number of subscribers listed in the advertisements under contract at the time the ad was published. SMN considered all affiliates under contract to be subscribers even if they were not on the air yet.

(6) None of the parties attending the November 1982 meeting could remember which ads were distributed at the meeting.

From this evidence, a fact finder could reasonably infer that:

(1) The Bobbitts and Rushing had as much or more experience in the broadcasting industry than Garrity.

(2) SMN's ads and Garrity's representations only went to what SMN's affiliates were doing at that time and did not go to what Angelo would do in the future.

(3) SMN's projections in its ads concerning the number of affiliates it had under contract were reasonable in light of the lead time needed for publication.

A review of the above evidence and the resulting inferences supports a puffery instruction. Further, a puffery instruction would have assisted the jury in answering the issue submitted on fraud. Without an instruction on puffery, the jury was presented with a dichotomy of misrepresentation or no misrepresentation, without anything in between. Some evidence exists to support a finding of puffery and some evidence exists to support a finding of mis-

representation. The jury, however, was allowed to consider only misrepresentation. Therefore, the trial court erred in refusing to submit SMN's requested "puffery" instruction to the jury.

### Conclusion

Because there is some evidence to support a finding of misrepresentation, the trial court erred in awarding SMN a judgment notwithstanding the verdict on Angelo's fraud claim. Because there is also evidence to support a jury instruction on puffery, the trial court erred in refusing to submit SMN's requested instruction. We expressly do not hold that Angelo established fraud as a matter of law. Rather, we hold that the evidence was not so insufficient as to support a judgment notwithstanding the verdict, and we will not speculate on the decision that the jury might have reached had it received an instruction on puffery. We sustain both Angelo's first point of error and SMN's seventh cross-point of error.

### ATTORNEYS' FEES

In its fourth point of error, Angelo contends that the trial court erred in awarding SMN its attorneys' fees. Angelo argues that there is no statutory authorization for the award. Angelo further argues that SMN's commission of fraud in connection with the transaction bars any recovery for breach of contract. SMN argues that, since Angelo failed to prove fraud and SMN proved unjust enrichment, SMN is entitled to recover its attorneys' fees under section 38.001 of the Texas Civil Practice and Remedies Code.

To recover attorneys' fees under section 38.001, the attorneys' fee claimant must first present a valid claim. Additionally, there must be a recovery of money or something of value. Otherwise, the attorneys' fee award is not in addition to the claimant's relief as required by the statute. *ITT Commercial Fin. Corp. v. Riehn,* 796 S.W.2d 248, 256 (Tex.App.—Dallas 1990, no writ). Because we determined under Angelo's second point of error that the trial court erred in awarding SMN recovery for unjust enrichment, the trial court also erred in awarding SMN its attorneys' fees. We sustain Angelo's fourth point of error.

### DTPA

In its second cross-point, SMN contends that the trial court erred in awarding Angelo DTPA damages. SMN argues that Angelo failed to give the requisite statutory DTPA notice. In its third and fourth cross-points, SMN contends that the trial court erred in (1) abating the case post-trial to allow Angelo an opportunity to send the prerequisite DTPA notice, (2) allowing Angelo a post-trial amendment alleging that it gave the DTPA notice, and (3) entering judgment in Angelo's favor on its DTPA claims. Angelo responds that, since its suit was instituted as a counterclaim, it was not required to give notice. Alternatively, Angelo argues that SMN waived any complaint relating to the lack of statutory notice under the DTPA.

Section 17.505 of the Texas Business and Commerce Code provides that a plaintiff seeking damages under the DTPA must "give written notice to the person at least 60 days before filing the suit." TEX.BUS. & COM.CODE ANN. § 17.505(a) (Vernon Supp.1992); *Cail v. Service Motors, Inc.,* 660 S.W.2d 814, 815 (Tex. 1983). This statutory notice requirement is designed to afford the opportunity for presuit negotiations and settlement to avoid lengthy and costly litigation. *Hash v. Hines,* 796 S.W.2d 312, 315 (Tex.App.—Amarillo 1990, writ granted); *Sunshine Datsun, Inc. v. Ramsey,* 680 S.W.2d 652, 655 (Tex.App.—Amarillo 1984, no writ). The requirement mandates a written notice *prior* to filing suit. *Hash,* 796 S.W.2d at 315; *The Moving Co. v. Whitten,* 717 S.W.2d 117, 123 (Tex.App.—Houston [14th Dist.] 1986, writ ref'd n.r.e.). The burden to plead and prove compliance with the notice provision rests on the party seeking recovery. The party seeking to deny recovery, however, must point out the failure to plead or prove notice. Otherwise, the complaint is waived. *HOW Ins. Co. v. Patriot Fin. Servs.,* 786 S.W.2d 533, 537 (Tex. App.—Austin 1990, no writ). There can be

no recovery absent the required presuit notice. *Sunshine Datsun,* 680 S.W.2d at 654–55.

### Counterclaim Exception

 Angelo argues that it was not required to give notice because it filed its suit as a counterclaim. Statutory notice is not required if the giving of the "consumer's claim is asserted by way of counterclaim." TEX.BUS. & COM.CODE ANN. § 17.505(b) (Vernon Supp.1992).

 The record shows that:

(1) SMN filed suit against Angelo in Dallas on February 11, 1985, alleging breach of contract, or alternatively, unjust enrichment.

(2) Later that same day, Angelo filed suit against SMN in Austin alleging DTPA violations.

(3) On February 28, 1985, SMN filed its answer asserting that Angelo failed to give notice and demand as required by the DTPA. SMN also moved to transfer venue to Dallas.

(4) After the Austin action was transferred to Dallas in June 1987, Angelo continued to rely on its Austin petition. It did not file a counterclaim until February 1989. Shortly thereafter, the two causes of action were consolidated.

(5) On October 30, 1989, the trial court ordered the parties to engage in mediation in an attempt to settle the suit.

(6) In its third amended answer to Angelo's counterclaim filed on April 9, 1990, SMN asserted that Angelo failed to give the requisite DTPA notice and demand.

(7) On April 12, 1990, the court granted Angelo's motion to realign the parties, designating Angelo as plaintiff and SMN as defendant.

(8) After realignment, Angelo pleaded DTPA violations and generally asserted that all conditions precedent to its right to recover had been performed or had occurred.

(9) In its answer, SMN specifically denied receiving the required statutory DTPA notice and moved to abate the case. At the hearing on SMN's mo-

tion, Angelo argued that SMN waived its right to notice by waiting five years to raise it. Angelo did not argue that it was entitled to the counterclaim exception. The trial court denied SMN's motion.

(10) In its motion for judgment notwithstanding the verdict filed on November 20, 1990, SMN again raised Angelo's failure to give the required statutory DTPA notice.

(11) In Angelo's response to SMN's motion for judgment notwithstanding the verdict, it asserted that, since both parties had treated Angelo's claim as a counterclaim, notice was unnecessary under the statute.

(12) On November 26, 1990, after reconsidering SMN's plea in abatement, the court "in an abundance of caution" abated the case for a sixty-five day period to allow Angelo the opportunity to send SMN a demand letter.

(13) The next day, Angelo gave notice and made demand on SMN for $3.25 million, which represented recovery under the jury findings including fraud. Angelo stated in its demand letter that it did not intend to waive or concede the necessity of the demand letter because its claim under the DTPA was and is a counterclaim.

(14) In response, SMN offered to settle with Angelo for the actual damages found by the jury on its DTPA claim, $700,000, plus Angelo's attorneys' fees of $170,249.

(15) Angelo rejected this settlement offer.

(16) The trial court reduced the judgment to reflect SMN's rejected settlement offer. On February 27, 1991, it granted Angelo's leave to file a trial amendment concerning DTPA notice and then entered judgment for Angelo on its DTPA claim.

Angelo began and ended this suit as the plaintiff. SMN denied receiving the requisite DTPA notice in response to Angelo's original petition, in response to Angelo's counterclaim, and in response to Angelo's

amended petition filed after realignment. Angelo raised the counterclaim exception for the first time as plaintiff in response to SMN's motion for judgment notwithstanding the verdict. Because Angelo began and ended the suit as plaintiff and never raised the counterclaim exception until after trial, Angelo had no right to rely on the counterclaim exception to the DTPA notice requirement.

### Waiver

■ Alternatively, Angelo, relying on *Star–Tel, Inc. v. Nacogdoches Telecommunications, Inc.*, 755 S.W.2d 146 (Tex. App.—Houston [1st Dist.] 1988, no writ), argues that SMN waived any complaint relating to the lack of statutory notice under the DTPA. Angelo misplaces its reliance on *Star–Tel*. In *Star–Tel*, the plaintiff alleged in its petition that it gave notice of the specific complaint, damages, and attorneys' fees, but the plaintiff did not allege that it had sent the notice thirty days prior to suit as required by the statute. 755 S.W.2d at 148. The defendants during trial, but before the jury charge, filed for the first time a special exception to the plaintiff's petition, alleging that the plaintiff had failed to plead the requisite statutory DTPA notice. *Id.* at 147. The court held that, although the plaintiff failed to comply fully with the notice requirement, the defendant waived its right to notice because it had all of the information necessary to offer settlement three years before the actual trial. The court, therefore, refused either to reverse the judgment and abate the case to allow for the thirty-day notice or to deny punitive damages. *Star–Tel*, 755 S.W.2d at 149.

Here, Angelo never pleaded notice prior to trial as mandated by the DTPA statute. SMN denied receiving notice in its response to Angelo's original petition, in its response to Angelo's counterclaim, and in response to Angelo's amended petition after realignment. Unlike the plaintiff in *Star–Tel*, Angelo did not merely fail to give adequate notice, it gave no notice. Because Angelo gave no notice, and SMN notified the court that it had not received notice every time it

was appropriate to do so, SMN did not waive its right to receive notice.

### Post-trial Abatement and Amendment

■ A trial court abuses its discretion when it acts without reference to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex.1985). The statutory notice requirement is designed to afford the opportunity for presuit negotiations and settlement to avoid lengthy and costly litigation. *Hash*, 796 S.W.2d at 315. If the party seeking recovery fails to give the requisite notice, the judgment should be reversed and the cause remanded with instructions for abating the action to afford the opportunity to give notice as a prerequisite to maintaining the action. *Hash*, 796 S.W.2d at 315; *Sunshine Datsun*, 680 S.W.2d at 655.

■ We find only one case in which a Texas court has declined to follow this rule. *Hollingsworth Roofing Co. v. Morrison*, 668 S.W.2d 872, 875 (Tex.App.—Fort Worth 1984, no writ). In that case, the plaintiff tendered timely written notice stating her intent to seek redress under the DTPA. She, however, mentioned no specific amount of damages. She merely stated the nature of her claim and that she was in the process of obtaining an estimate of the damages. The defendant brought the defect in the notice to the trial court's attention before trial. The court stated that at that point the trial court should have abated the case for thirty days. The court then held that when the plaintiff fails to give the required DTPA notice and the trial court does not abate the action for thirty days prior to trial on the merits, the plaintiff is not entitled to receive punitive damages under the DTPA. It reasoned that reversing and then abating the cause for thirty days, after a trial on the merits had already taken place, would defeat the basic purpose of the DTPA's required notice, which is to encourage settlement and avoid the costs of litigation. *Hollingsworth*, 668 S.W.2d at 875.

Here, rather than abating the case and ordering a new trial or denying Angelo its

punitive damages, the trial court abated the case post-trial to allow Angelo to give SMN the requisite notice, allowed Angelo to file a trial amendment alleging DTPA notice, and entered judgment on Angelo's *full* DTPA claim. We find no case where any Texas court has ever abated a case post-trial to allow for the giving of presuit notice and then entered judgment for actual and additional DTPA damages upon the verdict resulting from the trial. Because the trial court acted without any reference to guiding rules or principles, it abused its discretion in abating the case post-trial, in allowing Angelo to file a trial amendment, and in entering judgment for Angelo on its full DTPA claim.

### Conclusion

Because (1) Angelo had no right to rely on the counterclaim exception to the DTPA notice requirement, (2) SMN did not waive its right to receive notice, and (3) the trial court abused its discretion in allowing a post-trial abatement and amendment, the trial court erred in awarding Angelo DTPA damages. We sustain SMN's second, third, and fourth cross-points.

### CONCLUSION

In light of our disposition of SMN's second, third, and fourth cross-points, we need not reach SMN's remaining cross-points concerning the submission of jury questions three and five and the amount of the DTPA damage award. In light of our disposition of SMN's seventh cross-point that the trial court erred in failing to submit a jury instruction on puffery, we need not address SMN's sixth cross-point concerning whether there is no evidence or, alternatively, insufficient evidence to support the jury's DTPA finding. Because the trial court erred in awarding SMN recovery for unjust enrichment and in awarding SMN its attorneys' fees, we reverse and render a take-nothing judgment in Angelo's favor on SMN's claims for unjust enrichment and for attorneys' fees. Because Angelo failed to give the requisite DTPA notice and the trial court erred in abating the case post-trial and in allowing Angelo to file a post-

trial amendment concerning notice, we reverse the trial court's award of DTPA damages to Angelo and instruct the trial court to abate this cause of action for sixty days to afford Angelo the opportunity to give the requisite notice. On remand, Angelo's notice letter may not demand that SMN reimburse it for its expenses incurred in connection with any aspect of this lawsuit, from filing through appeal. Angelo may, however, demand reimbursement for presuit expenses, including attorneys' fees. *HOW Ins.*, 786 S.W.2d at 538. Because there is some evidence to support the jury's finding of fraud and evidence to support a "puffery" instruction to the jury, we reverse the trial court's judgment notwithstanding the verdict on Angelo's fraud claim and remand for further proceedings. In light of our decision to reverse and remand this case solely on Angelo's fraud and DTPA claims, we do not reach the question raised by SMN's first cross-point of error whether the trial court, considering the claims before it at the time, properly realigned the parties.