In re **CENTURY OFFSHORE MANAGEMENT CORP.,** Debtor.

**UNITED STATES of America, Appellant,**

v.

**CENTURY OFFSHORE MANAGEMENT CORPORATION, Appellee.**

Civ. A. No. 95–116.
Bankruptcy No. 93–5–1340.

United States District Court,
E.D. Kentucky.

Aug. 4, 1995.

H. Rey Stroube, III, Akin, Gump, Strauss, Hauer & Feld, L.L.P., Houston, TX, for Century Offshore Management Corp.

David E. Middleton, U.S. Attys. Office, Lexington, KY, Sidney P. Levinson, Washington, DC, for U.S.

Terry Gibson, Trustee, Lexington, KY.

## OPINION AND ORDER

FORESTER, District Judge.

The United States of America, on behalf of the U.S. Department of the Interior, Bureau of Minerals Management Service ("MMS"), seeks to appeal the bankruptcy court's order of February 13, 1995 granting the motion of the appellee, Century Offshore Management Corporation ("Century"), for summary judgment and denying the United States' cross-motion for summary judgment.

## I. FACTS AND PROCEDURAL BACKGROUND

Prior to filing for bankruptcy under Chapter 11 of the United States Bankruptcy Code on August 23, 1993, Century entered into several oil and gas leases issued by MMS pursuant to the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. § 1331, et seq., and the regulations promulgated thereunder. The leases are located in offshore federal waters adjacent to Louisiana on the Outer Continental Shelf ("OCS") in the Gulf of Mexico. Among the OCS leases held by Century are the leases commonly known as the South Timbalier Block 107 Lease ("ST 107"), the West Cameron Block 368 Lease ("WC 368"), and the Breton Sound Block 53 Lease ("BS 53"). Century also entered into leases of two offshore blocks leased by the State of Louisiana, commonly known as the Breton Sound Block 52 Lease ("BS 52") and the Breton Sound Block 45 Lease ("BS 45"). Under OCSLA, the United States is entitled to receive a royalty payment from the federal lessees equal to a fixed percentage of the amount or value of the production saved, removed or sold.

In 1989 and 1990, Century and Enron Gas Marketing, Inc. ("Enron") entered into several gas purchase contracts under which Enron agreed to purchase certain minimum quantities of natural gas produced by Century from the ST 107 Lease, the WC 368 Lease, and the BS 53 Lease. Under the Gas Purchase Agreement executed on December 20, 1989 (the "ST 107 Base Contract"), Enron agreed to purchase a certain minimum quantity of natural gas each month that could not be less than the "Minimum Purchase Quantity" as defined in Section 1.1 of the ST 107 Base Contract, which provides:

> "Minimum Purchase Quantity", for any month during the term of this Agreement, shall mean the minimum quantity of Gas, expressed in MMBtu per day, that Buyer is obligated to purchase and receive, or pay if available and not taken, during the month, which quantity shall be ninety percent (90%) of the MDQ [Maximum Daily Quantity] times the number of days in such month.

If Enron failed to purchase that minimum quantity of natural gas in any month, Enron was required to make non-recoupable payments to Century, pursuant to Section 3.4 of the ST 107 Base Contract ("take-or-pay payments"). The ST 107 Base Contract, originally effective through March 31, 1996, was subsequently extended through October 31, 1996.

Similarly, under the Gas Purchase Agreement executed on March 27, 1990 (the "WC 368 Base Contract"), Enron agreed to purchase certain minimum quantities of natural gas produced by Century from the WC 368

Lease, the BS 45 Lease, and the BS 52 Lease on a monthly basis. Under Section 3.4 of the WC 368 Base Contract, Enron also agreed to make *non-recoupable* take-or-pay payments to Century in any month in which Enron failed to purchase that minimum quantity of natural gas. The term of the WC 368 Base Contract extended through September 30, 1995.

Due to a decline in the market price for gas, Enron informed Century in November 1991 that it wished to purchase the natural gas contracts between Century and Enron covering the ST 107, WC 368, and BS 53 leases. Century and Enron each prepared calculations of the present value of the payments that Enron would be required to make under the contracts during their remaining terms if Enron failed to purchase the minimum quantities of natural gas required by the ST 107 and WC 368 Base Contracts and instead paid Century the non-recoupable payments required by Section 3.4 of the ST 107 and WC 368 Base Contracts for failure to make those purchases. As a result of their calculations and negotiations, Century and Enron entered into a settlement agreement on February 12, 1992, whereby Enron made a lump sum, non-recoupable payment to Century of $12,250,000.00 and Enron was relieved of any obligation to make any further payments under the ST 107 and WC 368 Base Contracts as of January 1, 1992 (the "Enron settlement"). Century did not pay royalties to the federal government on any portion of that lump sum payment.

On February 11, 1994, the MMS filed a proof of claim alleging that it is the holder of an unsecured priority claim in the amount of $1,855,004.00 as oil and gas royalties on the Enron settlement. In support of its claim, the MMS alleges that as a result of Century's receipt of the lump sum payment from Enron, and by failing to pay its alleged royalty obligation, Century breached its lease agreement with the MMS. Century filed its objections to the MMS' proof of claim on May 13, 1994, denying that any mineral royalties are due.

On December 16, 1994, Century filed a motion for summary judgment seeking disallowance of the MMS' proof of claim, arguing that the MMS is not entitled to royalties on a contract settlement payment that Enron made to Century in order to terminate Enron's future obligations under the gas purchase contracts with Century. On January 17, 1995, the United States filed an opposition to Century's motion for summary judgment, and also filed a cross-motion for summary judgment seeking allowance of the MMS' proof of claim in the amount of $1,004,422.70, plus additional royalty payments of unspecified amounts which are allegedly due through September 30, 1995.

At a hearing held on January 20, 1995, the bankruptcy court ruled from the bench to sustain Century's motion for summary judgment and to overrule the United States' cross-motion for summary judgment. Thereafter, on February 13, 1995, the bankruptcy court entered a final judgment in favor of Century and issued a written opinion with findings of fact and conclusions of law. The United States filed its notice of appeal of January 27, 1995.

## II. THE BANKRUPTCY COURT'S ORDER

The bankruptcy court based its decision to grant Century's motion for summary judgment on several grounds. First, the bankruptcy court considered the statutory, regulatory, and contractual authority upon which the MMS based its royalty claim. The bankruptcy court adopted the Fifth Circuit Court of Appeal's interpretation of the term "value of production" in *Diamond Shamrock Exploration Corp. v. Hodel*, 853 F.2d 1159, 1168 (5th Cir.1988) and determined that under Section 8(a) of OCSLA, the regulations promulgated thereunder, and the OCS leases themselves, royalties are due on OCS leases only when there has been actual production, "meaning the severance of the minerals from the producing underground formation."

Applying that analysis to the present case, the bankruptcy court held that Enron's payment of $12,250,000.00 to Century was to terminate Enron's future obligations under the ST 107 and WC 368 Base Contracts to make non-recoupable payments to Century when Enron failed to purchase certain minimum quantities of natural gas, not for the

severance of natural gas. In other words, the payment was "not a price paid for either present or future deliveries of severed hydrocarbons to Enron." Consequently, the bankruptcy court held that, under OCSLA, the regulations promulgated thereunder, and the OCS leases, Enron's settlement payment to Century is not royalty bearing. Because the MMS' royalty claim is based on an interpretation of gross proceeds which exceeds its statutory, regulatory, and contractual authority, the bankruptcy court granted Century's motion for summary judgment and denied the United States' cross-motion for summary judgment.

The bankruptcy court further determined that the MMS' royalty claim is based on an interpretation of "gross proceeds" that is arbitrary and capricious. Specifically, the bankruptcy court determined that allowing the MMS' royalty claim would require the lessee to make two royalty payments on one sale, would provide a windfall benefit to the government, would unfairly deprive producers of admitted royalty overpayments, and would distort the concept of "fair market value" on which the royalty regulations are based.

Next, the bankruptcy court held that the MMS' interpretation of "gross proceeds" on which it relies was not adopted in compliance with the rulemaking requirements of the Administrative Procedure Act ("APA"), 5 U.S.C. § 553. According to the bankruptcy court, the royalty values, as set out in *Shell Offshore, Inc.*, Docket No. MMS–91–0171–OCS, must be rejected for failure to comply with the notice and comment provisions of the APA.

Finally, the bankruptcy court determined that MMS' new interpretation of "gross proceeds" should not be given retroactive effect based on the criteria established by the Department of Interior in *Sun Exploration and Production Co.*, 112 IBLA 373 (1990), in which the Interior Board of Land Appeals sharply limited the circumstances in which MMS may apply a new interpretation of a regulation retroactively. Based on *Sun Exploration*, the bankruptcy court concluded that even if the MMS' interpretation is other-wise lawful, the MMS' interpretation is unlawfully retroactive.

## III. ISSUES FOR REVIEW

The United States has presented two issues for appeal:

1. Whether the bankruptcy court erred in sustaining Century's motion for summary judgment?

2. Whether the bankruptcy court erred in denying the United States' cross-motion for summary judgment?

## IV. STANDARD FOR REVIEW

Rule 56 of the Federal Rules of Civil Procedure applies in adversary proceedings. Fed.R.Bankr.P. 7056. Pursuant to Rule 56, summary judgment is appropriate if the moving party establishes that there is no genuine issue of material fact for trial and that it is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The Court must consider all pleadings, depositions, affidavits, and admissions on file and draw reasonable inferences in favor of the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see Smith v. Hudson*, 600 F.2d 60 (6th Cir.), *cert. dismissed*, 444 U.S. 986, 100 S.Ct. 495, 62 L.Ed.2d 415 (1979).

Once the moving party shows that there is an absence of evidence to support the nonmoving party's case, the nonmoving party has the burden of coming forward with evidence raising a triable issue of fact. *Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. at 2553. To sustain this burden, it may not rest on the mere allegations of its pleadings. Instead, it must set forth specific facts showing that there is a genuine issue for trial. *Potter's Med. Center v. City Hosp. Ass'n*, 800 F.2d 568 (6th Cir.1986). Ultimately, the standard for determining whether summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1310 (6th Cir. 1989) (quoting *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2511–12, 91 L.Ed.2d 202 (1986)).

Review of an order of the bankruptcy court granting summary judgment is *de novo. See, e.g., Berlin v. Michigan Bell Tel. Co.*, 858 F.2d 1154, 1161 (6th Cir.1988). Based on a *de novo* review of the record and applying the Rule 56 standards, the Court determines that the bankruptcy court was correct as a matter of fact and law in granting Century's motion for summary judgment and denying the United States' motion for summary judgment.

## V. THE BANKRUPTCY COURT DID NOT ERR IN GRANTING CENTURY'S MOTION FOR SUMMARY JUDGMENT

### A. THE ROYALTY CLAIM EXCEEDS THE MMS' STATUTORY, REGULATORY, AND CONTRACTUAL AUTHORITY

█ The bankruptcy court correctly concluded that the MMS' royalty claim exceeds the statutory, regulatory, and contractual authority of the MMS. Section 8(a) of OCSLA provides that the United States is entitled to a royalty based on a percentage of the "amount or value of the production saved, removed, or sold" from the leased premises. 43 U.S.C. § 1337(a). Pursuant to OCSLA, the Department of the Interior ("DOI") has promulgated regulations which interpret Section 8(a). Specifically, 30 C.F.R. § 206.152(h)—the "gross proceeds rule"—provides:

> Notwithstanding any other provision of this section, under no circumstances shall the value of production for royalty purposes be less than the gross proceeds accruing to the lessee for lease production, less applicable allowances determined pursuant to this subpart.

The royalty provisions of the ST 107, WC 368, and BS 53 leases essentially track the language of Section 8(a) and the gross proceeds rule. Section 6(b) of the OCS Leases, including the leases at issue in this proceeding, provides in relevant part:

> [T]he value of production for the purposes of computing royalty shall not be deemed

to be less than the gross proceeds accruing to the Lessee from the sale thereof.

Construing the term "value of production," the Fifth Circuit Court of Appeals in *Diamond Shamrock Exploration Corp. v. Hodel*, 853 F.2d 1159, 1168 (5th Cir.1988), determined that production is defined as the actual physical severance of the mineral from the formation.

Under the ST 107 and WC 368 Base Contracts, Enron agreed to purchase certain minimum quantities of gas from Century each month; failure to purchase that minimum quantity resulted in Enron's obligation to make non-recoupable payments to Century. While negotiating the settlement agreement, Enron and Century calculated the non-recoupable payments that Enron would have made to Century during the period of the Base Contracts in the event that Enron failed to purchase the minimum monthly quantities of gas as required by the Base Contracts. Based on these calculations, Enron and Century agreed that Enron would pay $12,250,000.00 to Century. In return, Century would extinguish Enron's future obligations under the Base Contracts.

Although the bankruptcy court determined that Enron's settlement payment was not for natural gas but rather to terminate the gas purchase contracts, the MMS argues that it is "permissible" under the gross proceeds rule for the government to treat Enron's settlement payment as a prepayment to purchase natural gas in the future from the covered leases. Consequently, the MMS argues that the Court should defer to the government's interpretation of the gross proceeds rule pursuant to the rules of statutory construction set out by the Supreme Court in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984). According to *Chevron*, when a court reviews an agency's interpretation of a statute authorizing administration of the agency's programs, the "question for the court is whether the agency's answer is based on a permissible construction of the statute."

The MMS relies on its interpretation of the gross proceeds rule as set forth in *Shell Offshore, Inc.*, Docket No. MMS–91–0171–

OCS (September 2, 1994) and *Samedan Oil Corp.*, Docket No. MMS–94–0003–IND (September 16, 1994). In *Shell Offshore,* the Assistant Secretary ruled that payments under contract settlements are royalty bearing if and when there is production of the gas to which the payments are attributable. However, if no gas is produced, the lessee does not owe royalties to the government. In *Samedan,* the lessee, Samedan Oil Corporation ("Samedan"), appealed the decision of the MMS which assessed $20,000.00 in royalties against Samedan to the Assistant Secretary for the DOI. Samedan and Southern Natural Gas Company ("Southern") entered into a gas purchase contract in 1981 which contained take-or-pay provisions which required Southern to pay for a minimum quantity of gas each year, even if it did not take that amount. However, to the extent that Southern purchased gas in excess of the specified minimum in a given year, it could credit payments for gas not taken over the five preceding years against the purchase of an equivalent quantity of the current year's excess. As a result of the decline in both the sales and market price of natural gas, Samedan and Southern entered into a settlement agreement on December 1, 1987 whereby Southern was released from all past and future obligations under the 1981 contract and Southern paid Samedan $100,000.00.

On December 2, 1987, the MMS issued an order requiring Samedan to pay $20,000.00 in royalties based on the settlement. This order was appealed to the Assistant Secretary of the DOI. In an opinion affirming the MMS' decision, the Assistant Secretary held that Southern's buyout payment was subject to a royalty when production of the bought out volumes occurred and the gas was sold to subsequent purchasers at a discounted price.

 The MMS argues that this Court should defer to its interpretation of "gross proceeds," as set out in *Shell Offshore* and *Samedan,* and require that Century pay a royalty to the government on Enron's payment that was made in compromise of non-recoupable take-or-pay payments. As pointed out by the bankruptcy court, however, there is no need or obligation for this Court to defer to an agency decision when a court

has already issued a definitive interpretation of the statute, the implementing regulations, and the relevant contract provisions. *Variable Annuity Life Insurance Co. v. Clarke,* 998 F.2d 1295 (5th Cir.1993). Not only has the court in *Diamond Shamrock* interpreted Section 8(a) of OCSLA and the gross proceeds rule contained in the regulations, but the MMS has amended the royalty regulations to conform to that interpretation. Therefore, it is not necessary for the Court to defer to the agency's interpretation of "gross proceeds" as set forth in *Shell Offshore* and *Samedan.*

 Even if deference was appropriate, the Court would be required to reject the MMS' interpretation of "gross proceeds" as impermissible. Enron's payment to Century was not for present or future deliveries of severed natural gas to Enron; rather it was to terminate Enron's future obligations under the ST 107 and WC 368 Base Contracts. According to Section 8(a) of OCSLA and the gross proceeds rule, as well as the language contained in the royalty provisions of the OCS leases, royalties are due only where there has been production, meaning the severance of minerals from the producing underground formation. A royalty is not due on a take-or-pay payment because that payment was not made for severed gas but rather because the purchaser failed to purchase gas. *Diamond Shamrock,* 853 F.2d at 1167–68. By interpreting "gross proceeds" to include payments made not for natural gas but rather to terminate a contractual obligation, the MMS exceeded its statutory, regulatory, and contractual authority and, therefore, the MMS' interpretation of "gross proceeds" is impermissible. As no genuine issue of material fact exists on this issue, the bankruptcy court correctly granted Century's motion for summary judgment and denied the United States' cross-motion for summary judgment.

**B. THE ROYALTY CLAIM IS BASED ON AN INTERPRETATION OF THE GROSS PROCEEDS RULE THAT IS ARBITRARY AND CAPRICIOUS**

 The bankruptcy court also determined that the MMS' royalty claim is based

on an interpretation of the gross proceeds rule that is arbitrary and capricious. This court agrees with the bankruptcy court for several reasons. First, the MMS' interpretation of gross proceeds would necessitate two royalty payments for one sale of natural gas in almost every case where the producer sells natural gas after the original contract is terminated. *See Diamond Shamrock,* 853 F.2d at 1166. Not only would the producer be required to pay one royalty based on the proceeds received for the sale of natural gas under a successor contract, but the producer must also pay a second royalty on the same sale based on the portion of the settlement payment which the MMS allocates to that sale.

■ Second, as recognized by the court in *Diamond Shamrock,* the purpose of the minimum take requirements is to apportion risk between the buyer and seller of the natural gas by compensating the producer, not the owner of the minerals, for the risks associated with development and production. *Id.* at 1167. According to *Diamond Shamrock:*

> [T]his is the precise reason for entering into a lease agreement. The government leases oil producing lands in order to, among other things, reap the benefits, through royalty payments, without having to shoulder the associated risks of exploration, production and development.

*Id.* It would be irrational to let the government share in any revenues that the producer realized by taking those market risks while simultaneously protecting the government from any and all losses suffered by the producer as a result of taking those same risks.

Third, the court in *Diamond Shamrock* also determined that the position put forth by the MMS could in some cases unfairly deprive producers of refunds of admitted royalty overpayments, resulting in a windfall to the government. *Id.* at 1166. Under OCSLA, a producer only has two years in which to seek a royalty refund of a royalty overpayment made on a federal offshore lease. 43 U.S.C. § 1339. On the other hand, the government claims to have broad discretion to reallocate a settlement payment among the various issues settled and/or

among the various leases covered by the settlement. Thus, the government may delay challenges of this type until after the two year time limit on refunds has expired. Consequently, in many instances, producers could lose the right to a refund of an admitted royalty overpayment merely because of the government's lack of diligence in pursuing this type of claim.

Finally, the MMS' interpretation of "gross proceeds" distorts the concept of "fair market value" on which the government's royalty regulations are based. According to the MMS, a payment made to terminate future obligations under a gas purchase contract is part of the "market value" of natural gas that will be produced and sold at a later time to the same or a different purchaser. But if the purchaser does not take gas under the original gas purchase contract, there is no market for that gas. Thus, it is nonsensical to claim that any portion of the settlement payment is part of the "fair market value" of gas sold at a later time under a different contract.

The government's claim in this case is based on an interpretation of "gross proceeds" which produces the same unsound and untenable results which troubled the court in *Diamond Shamrock.* Thus, the bankruptcy court correctly determined that the MMS' royalty claim is based on an interpretation of "gross proceeds" which is arbitrary and capricious.

## C. THE ROYALTY CLAIM IS UNLAWFULLY RETROACTIVE

■ The bankruptcy court further determined that the MMS' royalty claim is based on an interpretation of "gross proceeds" that is unlawfully retroactive under the criteria established by the MMS in *Sun Exploration and Production Co.,* 112 IBLA 373 (1990). The interpretation upon which the MMS relies was issued in *Shell Offshore* more than two years after the settlement between Century and Enron and more than seven months after the MMS filed its royalty claim in this case.

■ In *Sun Exploration,* the Interior Board of Land Appeals ("IBLA") sharply limited the circumstances in which the MMS

may apply a new interpretation of a regulation retroactively. Specifically, the IBLA held that when the MMS departs from a prior administrative position and seeks to apply a new position retroactively, it is not enough for the agency to demonstrate that its new interpretation is within the meaning of the law. *Id.* at 387. Rather, the IBLA held that the burden of clearly setting forth and identifying its change in sufficient detail to show that the departure from the prior position was not arbitrary and capricious. *Id.* at 387–88. Furthermore, the MMS must satisfy the balancing test set out in *Retail, Wholesale & Dep't Store Union v. NLRB,* 466 F.2d 380, 390 (D.C.Cir.1972), which requires the court to determine:

(1) whether the case is one of first impression; (2) whether the new rule is an abrupt departure from well-established practice or merely an attempt to fill an unsettled area of law; (3) the extent to which the party against whom the new rule is applied relied on the old rule: (4) the burden which a retroactive order imposes on that party; and (5) the statutory interest in applying a new rule retroactively.

This Court agrees with the bankruptcy court that the MMS did not even attempt to satisfy its burden of proving that its interpretation of "gross proceeds" should be made retroactive under the criteria established in *Sun Exploration.* Therefore, the bankruptcy court correctly determined that the interpretation upon which MMS' royalty claim is based cannot be applied retroactively to this action.

### D. *IPAA v. BABBITT* IS NOT BINDING ON THIS COURT

In *Independent Petroleum Association of America v. Babbitt,* Docket No. Civ.A. No. 932544 (RCL) (D.C.1995), which affirmed the Assistant Secretary's decision in *Samedan, supra,* the district court considered whether the government was entitled to royalties on a gas settlement contract entered into between Samedan and Southern. The district court determined that the MMS' order to pay royalties is in accordance with the law and is a permissible construction of the agency's rules and regulations and affirmed the Assistant

Secretary's decision requiring Samedan to pay $20,000.00 in royalties to the United States.

Although the Court has reviewed and considered the decision of the court in *IPAA v. Babbitt,* that opinion is not binding on this Court. Moreover, the IPAA recently filed a notice appealing the decision in that case to the United States Court of Appeals for the District of Columbia Circuit.

### E. THE BANKRUPTCY COURT ERRED IN HOLDING THAT THE ROYALTY CLAIM IS BASED ON AN INTERPRETATION OF THE GROSS PROCEEDS RULE THAT WAS ADOPTED IN VIOLATION OF THE APA'S NOTICE AND COMMENT REQUIREMENT

Although the bankruptcy court correctly determined that the MMS' royalty claim exceeds the MMS' statutory, regulatory, and contractual authority, is arbitrary and capricious, and is unlawfully retroactive, the bankruptcy court erred when it held that the MMS' royalty claim was based on an interpretation of the gross proceeds rule that was adopted in violation of the APA. The bankruptcy court held that the Assistant Secretary of the DOI, in issuing *Shell Offshore,* failed to comply with the rulemaking requirements of the APA. Generally, the APA requires notice and an opportunity for comment before a rule can be implemented. 5 U.S.C. § 553(b). However, in *Shalala v. Guernsey Memorial Hospital,* —— U.S. ——, 115 S.Ct. 1232, 131 L.Ed.2d 106 (1995), the Supreme Court recently held that notice and comment are not required under the APA when an agency issues an interpretative rule. An "interpretative rule" is defined as a rule "issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers." *Id.* at 1238. Because the decision in *Shell Offshore* advises the public of the DOI's construction of OCSLA and the gross proceeds rule as applied to contract settlement payments, it is an interpretative rule and the APA's notice and comment requirements are not required. Consequently, the bankruptcy court erred in concluding that the Assistant Secretary's decision in *Shell Offshore* failed to comply with

the APA's notice and comment requirements. This error, however, does not affect the other grounds on which the bankruptcy court granted Century's motion for summary judgment.

## VI. THE BANKRUPTCY COURT DID NOT ERR IN DENYING THE UNITED STATES' CROSS–MOTION FOR SUMMARY JUDGMENT

For the foregoing reasons, the bankruptcy court did not err in granting Century's motion for summary judgment and denying the United States' cross-motion for summary judgment.

## VII. CONCLUSION

For the foregoing reasons, the bankruptcy court correctly granted Century's motion for summary judgment and denied the United States' cross-motion for summary judgment. Accordingly, the Court hereby ORDERS:

(1) the motion for oral argument [docket entry 8] is DENIED;

(2) the bankruptcy court's order of February 13, 1995 is AFFIRMED; and

(3) this matter is STRICKEN from the active docket.