**TRANSAMERICAN NATURAL GAS CORPORATION and TransTexas Gas Corporation, Appellants,**

v.

**H.S. FINKELSTEIN, Appellee.**

**No. 04–95–00365–CV.**

Court of Appeals of Texas,
San Antonio.

Aug. 14, 1996.

Opinion on Denial of Rehearing
Oct. 9, 1996.

Rehearing Overruled Oct. 9, 1996.

L.L.P., Dallas, Morgan L. Copeland, Scott, Douglass, Luton & McConnico, L.L.P., Houston, Arturo A. ·Figueroa, Jr., Timothy E. Gehl, Law Offices of Arturo A. Figueroa, Zapata, Robert J. Hearon, Jr., Graves, Dougherty, Hearon & Moody, Austin, Gregory Luna, Luna & Luna, San Antonio, Michael B. Silva, amicus curiae, Paul F. Simpson, Silva & Simpson, L.L.P., Houston, John S. Lowe, amicus curiae, George W. Hutchison, Southern Methodist University School of Law, Dallas, James N. Castleberry, Jr., amicus curiae, San Antonio, Edwin P. Horner, amicus curiae, Waco, Everard A. Marseglia, Jr., amicus curiae, Burns, Wooley & Marseglia, L.L.P., Houston, for appellee.

Before CHAPA, C.J., and RICKHOFF, LOPEZ, STONE, HARDBERGER, GREEN and DUNCAN, JJ., en banc.

### OPINION ON APPELLANTS' MOTION FOR REHEARING EN BANC

CHAPA, Chief Justice.

This appeal questions whether a royalty owner is entitled to share in the settlement proceeds arising from the breach of a take-or-pay oil and gas contract when some of the gas not taken is sold on the spot market. The appellants, TransAmerican Natural Gas Corporation and TransTexas Gas Corporation (collectively, TransAmerican), filed a motion for rehearing and motion for rehearing en banc after this court issued its panel opinion of April 3, 1996. We grant TransAmerican's motion for rehearing en banc and deny its motion for rehearing as moot. Furthermore, we withdraw our earlier opinion and substitute this opinion in its place. Although we adopt the panel's holding regarding TransAmerican's affirmative defenses, we reject its discussion of TransAmerican's marketing duty. We reverse and render because a royalty owner is not entitled to settlement proceeds from a take-or-pay contract absent lease language to that effect.

### Summary of Facts

In 1974, John R. Stanley, owner of TransAmerican and its predecessors, assigned Hub Finkelstein, an independent oil producer, an overriding royalty interest

David M. Gunn, Rothenberg & Gunn, Bellaire, C.M. Zaffirini, Zaffirini, Castillo & Pellegrin, Laredo, Jeff Wentworth, San Antonio, Fred Wahrlich, TransTexas Gas Corporation, Houston, Roy R. Barrera, Jr., Nicholas & Barrera, P.C., San Antonio, for appellants.

Elizabeth N. Miller, Steve Selby, Bob Bullock, Martin L. Allday, Scott, Douglass, Luton & McConnico, L.L.P., Austin, Frank Douglass, Scott, Douglass, Luton & McConnico,

"equivalent to 1/16 of the net revenue interest" from all mineral rights Finkelstein secured for TransAmerican.[1] In addition, Finkelstein was required to sell his gas to TransAmerican under a gas purchase agreement. A year later, Finkelstein arranged for TransAmerican and El Paso Natural Gas (El Paso) to enter into a farmout agreement for the La Perla Ranch in Zapata County, Texas.[2] However, Finkelstein was not a party to this contract between TransAmerican and El Paso. As a result of his prior agreement with TransAmerican, Finkelstein earned a 1/16th overriding royalty interest in the La Perla Ranch, subject to El Paso's preferential right to purchase.

In 1981, El Paso exercised its preferential purchase right to purchase. It entered into a long-term gas purchase agreement with TransAmerican, but once again Finkelstein was not a party to the contract. Under this gas purchase contract, TransAmerican dedicated its entire interest in the La Perla Ranch to El Paso. In exchange, El Paso agreed to take or, if it did not take, pay for 80 percent of the La Perla production for a fifteen-year term. El Paso also received a five-year make-up or recoupment right, which entitled it to later take "gas which it paid for but did not receive" at the delivery price minus the take-or-pay payment.[3]

In 1983, as a result of sharply declining gas prices, El Paso filed a declaratory judgment action seeking to avoid the take-or-pay provision of its gas purchase contract with TransAmerican. TransAmerican counterclaimed for underpayment of gas and for breach of the take-or-pay provision. During that litigation, TransAmerican continued to sell gas on the spot market for less than the price El Paso had agreed to pay.

Also in 1983, TransAmerican filed Chapter 11 bankruptcy, and Finkelstein filed an adversary claim for, among other things, unpaid royalties and breach of his gas purchase agreement with TransAmerican. Finkelstein's claims were settled in 1987. The settlement (1) confirmed Finkelstein's 1/16th overriding royalty in the La Perla Ranch; (2) paid Finkelstein for accrued underpaid and unpaid royalties, a portion of which was to come from the still pending litigation with El Paso; and (3) conveyed to Finkelstein an additional 1½ percent overriding royalty in the La Perla field equivalent to "net revenue interest of .015."

In 1990, after the trial court rendered a $603 million judgment against El Paso, TransAmerican settled its dispute with El Paso for cash and property valued at $360 million. As part of the settlement, the parties terminated their prior agreements, including the 1975 farmout and 1981 gas purchase contract. As a result, El Paso's make-up right was terminated. El Paso conveyed its interest in the La Perla Ranch to TransAmerican, which, in turn, released its claims and those of its "assigns." Although Finkelstein was not a party to the TransAmerican/El Paso contract nor did he participate in their settlement agreement, the settlement terminated his interest in the La Perla Ranch. *See Medallion Oil Co. v. TransAmerican Natural Gas Corp. (In re GHR Energy Corp.),* 972 F.2d 96, 99–100 (5th Cir. 1992), *cert. denied,* 507 U.S. 1042, 113 S.Ct. 1879, 123 L.Ed.2d 497 (1993) (explaining that Finkelstein's overriding royalty was "washed out" by the termination of TransAmerican's lease).

Although TransAmerican paid Finkelstein royalty on the gas it produced and sold on the spot market during its litigation with El

---

1. An overriding royalty is an interest carved out of, and constituting a part of, the working interest created by an oil and gas lease. *Gruss v. Cummins,* 329 S.W.2d 496, 501 (Tex.Civ.App.—El Paso 1959, writ ref'd r.n.e.).

2. In a farmout agreement, the owner of the lease assigns the lease or some portion of it to another operator who is willing to drill the tract. *Mengden v. Peninsula Prod. Co.,* 544 S.W.2d 643, 645 n. 1 (Tex.1976) (quoting WILLIAMS AND MEYERS, OIL AND GAS LAW, MANUAL OF TERMS 167 (1971)).

3. When gas is made up, there is no double payment. Randy King, Note, *Royalty Owner Claims to Take–or–Pay Payments Under the Implied Covenant to Market and the Duty of Good Faith and Fair Dealing,* 33 S. TEX. L. REV. 801, 826 (1992). The lessor receives royalty on the total funds received by the producer (except for the time-value of the take-or-pay payments). *Id.*

Paso, it refused to pay Finkelstein any part of the El Paso settlement. Finkelstein sued TransAmerican to recover royalty on the amount paid by El Paso to settle Trans-American's "repudiation claim" for gas that TransAmerican produced and sold between October 1, 1987 through December 31, 1989; that is, the date Finkelstein began receiving royalty from TransAmerican under their 1987 settlement agreement and the last date on which Finkelstein owned a royalty interest in the La Perla Ranch. These "repudiation damages" represented the difference between the price under El Paso's gas purchase agreement and the lower spot market price.

The trial court submitted the case to the jury on Finkelstein's theories that Trans-American breached its duty to reasonably market and was unjustly enriched. The jury returned a verdict in Finkelstein's favor on both theories, and the trial court rendered judgment for $8,247,021 in actual damages and $4,458,158 in attorney's fees. Trans-American appealed; and, in four points of error, challenges the legal and factual basis of Finkelstein's recovery.

### TransAmerican's Affirmative Defenses

In its third point of error, TransAmerican argues that Finkelstein's claim is barred by the accord and satisfaction reflected in the 1987 settlement agreement and by res judicata. Because these arguments, if successful, would be dispositive of this appeal, we consider them first.

### 1. Accord and Satisfaction

 In points of error 3–A and 3–B, TransAmerican argues that, as a matter of law, Finkelstein's claim is barred by accord and satisfaction. Alternatively, TransAmerican argues that the jury's contrary finding is against the great weight and preponderance of the evidence. We review TransAmerican's sufficiency complaints under the well-established rules for measuring the legal and factual sufficiency of the evidence. *See* Robert W. Calvert, *"No Evidence" and "Insufficient*

---

*Evidence" Points of Error,* 38 Tex. L. Rev. 361, 362–68 (1960). While accord and satisfaction is a question of law reviewed de novo, the parties here disagree over the factual interpretation of the 1987 settlement agreement.

 The affirmative defense of accord and satisfaction "rests upon a new contract, express or implied, in which the parties agree to the discharge of the existing obligation by means of the lesser payment tendered and accepted." *Jenkins v. Henry C. Beck Co.,* 449 S.W.2d 454, 455 (Tex.1969). To prove that a particular agreement rises to the level of an accord and satisfaction, "[t]he evidence must establish an assent of the parties to an agreement that the amount paid by the debtor to the creditor was in full satisfaction of the entire claim." *Id.*

TransAmerican's evidence includes the following sentence taken from the 1987 settlement agreement:

> Another $367,000 is due under Adversary Proceeding No. 85–0946–H2–5 if the Debtors prevail in their suit against El Paso Natural Gas for gas sold and delivered, and shall be paid to [Finkelstein] upon receipt by the Debtors of satisfaction of such an award from El Paso.

Lifting this sentence out of context—and disregarding the phrase "sold and delivered"—lends some credence to TransAmerican's accord and satisfaction argument.

However, when read in context, the sentence refers to Finkelstein's claims for royalties accrued and unpaid prior to April 1987; the agreement did not purport to settle Finkelstein's claim to royalties accrued during the period at issue here, i.e., October 1, 1987 through December 31, 1989. *See Finkelstein v. TransAmerican Natural Gas Corp. (In re TransAmerican Natural Gas Corp.),* 127 B.R. 800, 803 (S.D.Tex.1991) (describing TransAmerican's "contention" as "erroneous. The $367,000 was for gas previously produced from La Perla and for which royalties were owing. The 1987 settlement did not involve royalties to future production.").[4]

---

4. Citing *Thermtron Products, Inc. v. Hermansdorfer,* 423 U.S. 336, 352–53, 96 S.Ct. 584, 594, 46 L.Ed.2d 542, 555 (1976), and *Missouri Pac. R.R.*

*v. Brown,* 862 S.W.2d 636, 639 (Tex.App.—Tyler 1993, writ denied), TransAmerican argues that the federal district court's remand order does not

The only evidence that supports any accord and satisfaction argument came from Craig Shephard, TransAmerican's former president and chief operating officer. Shephard testified that Finkelstein settled his claim in this litigation when he accepted the additional 1½ percent overriding royalty in the 1987 settlement agreement and released his claims against TransAmerican. Finkelstein, on the other hand, testified that he received the additional 1½ percent overriding royalty to settle his claim arising out of TransAmerican's rejection of his gas purchase agreement, and nothing in the 1987 settlement agreement was intended to settle his claim to a royalty interest in TransAmerican's repudiation damages.

The jury found that Finkelstein did not "accept the benefits of the Settlement of April 23, 1987, in satisfaction of all claims he would have arising out of the controversy between El Paso and TransAmerican." The jury's answer is supported by the evidence and the unambiguous terms of the agreement. Thus, we overrule TransAmerican's points of error 3–A and 3–B.

## 2. Res Judicata

■ TransAmerican asserts under points of error 3–C and 3–D that Finkelstein's claim is barred by res judicata, specifically section 1141 of the Bankruptcy Code. According to TransAmerican, section 1141 bars "all issues that could have been raised in connection with . . . confirmation" of a plan of reorganization. Finkelstein counters that his claim is not barred because it arose after the date TransAmerican's reorganization plan was confirmed.

■ The res judicata effect of a judgment rendered by a federal court is governed by federal res judicata law. *See Eagle Properties, Ltd. v. Scharbauer*, 807 S.W.2d 714, 718 (Tex.1990). For confirmation of bankruptcy plans, the federal law of res judicata is contained in section 1141 of the Bankruptcy Code, which provides that "the confirmation of a plan . . . discharges the debtor from any debt that arose *before the date of such confir-*

*mation*." 11 U.S.C.A. § 1141(d)(1)(A) (West 1993) (emphasis added).

The bankruptcy court confirmed TransAmerican's plan of reorganization on September 4, 1987. *In re TransAmerican Natural Gas Corp.*, 127 B.R. at 802. Finkelstein's claim in this litigation arose out of gas produced and sold between October 1, 1987 and December 31, 1989 and settlement monies paid to TransAmerican in early 1990. We agree with the conclusion of the federal district court that Finkelstein's claim arose after the date of confirmation and is not, therefore, barred by section 1141. *See id.* at 803. We overrule TransAmerican's points of error 3–C and 3–D.

### Breach of the Marketing Duty

■ In points of error 2–A and 2–B, TransAmerican maintains that, as a matter of law and the weight of the evidence, the trial court erred in rendering judgment against TransAmerican on the jury's finding that TransAmerican breached its duty to reasonably market Finkelstein's gas "because an overriding royalty interest owner is not entitled to share in the proceeds from a take-or-pay settlement."

■ Regarding the relevant law, the parties agree that actual production triggers the duty to reasonably market, which itself is subdivided into the twin duties of marketing production with due diligence and obtaining the best price reasonably possible. *Cabot Corp. v. Brown*, 754 S.W.2d 104, 106 (Tex. 1987). "Production" means the actual extraction of the mineral from the soil. *See Rogers v. Osborn*, 152 Tex. 540, 261 S.W.2d 311, 312 (1953). The standard of care is that of a reasonably prudent operator under the same or similar circumstances. *Amoco Prod. Co. v. Alexander*, 622 S.W.2d 563, 568 (Tex. 1981).

Regarding the facts, the parties agree that TransAmerican recovered damages for El Paso's breach of the take-or-pay contract. They also agree that, between October 1, 1987 and December 31, 1989, TransAmerican

---

preclude its accord and satisfaction argument because the order is neither final nor appealable. We do not decide this issue because the evidence

in this case establishes the factual inaccuracy of TransAmerican's position.

actually produced and sold on the spot market 84 billion cubic feet of gas from the La Perla Ranch. Finkelstein contends that, given these facts, TransAmerican received two prices for the produced gas: (1) the spot market price; and (2) when it settled with El Paso, the difference between the El Paso contract price and the spot market price. Finkelstein admits receiving royalty on the first and claims his entitlement to receive royalty on the second.

In *Bruni I,* we answered negatively the question of "whether a standard royalty clause applies to settlement of a take-or-pay provision." *Killam Oil Co. v. Bruni,* 806 S.W.2d 264, 266–68 (Tex.App.—San Antonio 1991, writ denied). Finkelstein attempts to distinguish this controlling authority on the basis of production and his royalty clause.

In *Bruni I,* the Bruni Mineral Trust entered into an oil and gas lease with Killam and Hurd which provided that royalties be paid on production. In pertinent part, the royalty clause stated:

> The *royalties* to be paid by lessee [Killam and Hurd] are: ... (b) on gas, including casinghead gas and all gaseous substances, *produced* from said land and *sold or used off the premises* or in the manufacture of gasoline or other product therefrom, the market value at the mouth of the well of one-eighth of the gas so *sold or used* provided that on gas *sold* at the wells the royalty shall be one-eighth of the amount realized from such.

*Killam Oil Co. v. Bruni,* 806 S.W.2d 264, 266 (Tex.App.—San Antonio 1991, writ denied) (emphasis in original).

After entering this lease, Killam and Hurd contracted to sell gas to United Texas Transmission Company (United) under a separate take-or-pay agreement with a five-year make-up right. *Id.* at 265. Killam sued United when it failed to take or pay, but Killam later settled. *Id.* Hurd settled without suit. *Id.* The Trust then sued Killam and Hurd for a share of the settlement proceeds on the basis of a constructive sale under its royalty clause as well as on theories of breach of the duty to market, breach of the duty of good faith and fair dealing, con-

version, fraud, unjust enrichment, and equitable reformation. *Id.*

In construing the Trust's royalty claim, we focused on the lease's requirement that gas be "produced" and "sold," i.e., severed from the soil. *Id.* at 267. By this language, "the Trust unambiguously limited its right to royalty payments only from gas actually extracted from the land." *Id.* at 268. We concluded that take-or-pay "payments are made when gas is *not produced,* and as such, bear no royalty." *Id.* (emphasis in original). This holding was recently approved by the Texas Supreme Court when it described the take-or-pay payment as compensation "for the exclusive dedication of reserves for a fixed period of time." *The Lenape Resources Corp. v. Tennessee Gas Pipeline Co.,* 925 S.W.2d 565, 570 (Tex.1996) (citing *Bruni I* ).

As we said in *Bruni I,* the royalties to which a lessor is entitled must be determined from the provisions of the oil and gas lease. 806 S.W.2d at 266 (citing *Texas Oil & Gas Corp. v. Vela,* 429 S.W.2d 866, 870 (Tex.1968)). When reading the lease, we give terms their plain, ordinary, and generally accepted meaning and will enforce the unambiguous document as written. *Heritage Resources, Inc. v. NationsBank,* 39 Tex. Sup. Ct. J. 537, 538–39, —— S.W.2d ——, ———, 1996 WL 200362 (April 25, 1996).

The 1974 agreement between TransAmerican and Finkelstein provided for "an overriding royalty interest equivalent to 1/16 of the net revenue interest acquired by" TransAmerican. The settlement agreement between TransAmerican and Finkelstein included an additional interest:

> [TransAmerican] hereby agree[s] to assign and convey to H.S. Finkelstein *an overriding royalty interest of one and one-half percent (1½%)* of all oil, gas, other hydrocarbons, and all other minerals, whether similar or dissimilar, and including, without being limited to, salt, sulphur, coal, lignite and uranium, *produced* and saved from or attributed to the interests owned by [TransAmerican] ... in and to all (i) gas leases, oil and gas leases, oil, gas and mineral leases ..., (ii) development agreements, joint development agreements, farmout agreements, farmin

agreements, contracts to lease, net revenue interest agreements, and, without exception, all other agreements which have as their purpose or will involve or be concerned with the exploration, drilling and/or *production* of oil, gas and/or other minerals ... and (iii) all other interests in land, including, but not limited to, fee mineral interests, royalty interests, overriding royalty interests, net profits interests, *production payments* and other similar interests in production of oil, gas and/or other minerals. . . .

(Emphasis added).

Like the lease in *Bruni I*, Finkelstein's lease is tied to production.[5] By this language, Finkelstein unambiguously limited his right to royalty payments from gas actually extracted from the land. *See Bruni I*, 806 S.W.2d at 268. Additionally, without production, TransAmerican's duty to reasonably market was not triggered. *See Cabot Corp.*, 754 S.W.2d at 106. Given the particular recitations of this lease for various types of interest, none of which mention take-or-pay contracts, we cannot read the clause "net revenue interest" as including take-or-pay settlements which, by their very nature, are not payments for gas produced. *See Danciger Oil & Ref. Co. v. Powell*, 137 Tex. 484, 154 S.W.2d 632, 635 (1941) (advising courts not to read into the lease additional provisions). Finkelstein, like the Bruni Trust, could have (but did not) specifically include a provision that allowed for royalty to be paid upon proceeds received from settlements arising from the breach of take-or-pay gas contracts.[6] Finkelstein enjoyed a position to do exactly that by virtue of his experience in the oil and gas industry and his involvement in the TransAmerican/El Paso negotiations.

Finkelstein maintains that *Bruni I* is distinguishable because it did not involve gas production where the purchaser lost its right

to recoup gas but nonetheless "paid" for the gas sold to third parties through "repudiation" damages. This issue was raised in *Bruni I*, where the Trust argued that United's settlement "might have included underpayment for gas sold on the spot market," 806 S.W.2d at 267, but we declined to address "the Trust's contention as to what the proceeds might have represented." *Id.* at 268.[7] The underpayment was irrelevant to our analysis because the gas contract was independent of the lease. *See id.* at 267 (citing *Exxon Corp. v. Middleton*, 613 S.W.2d 240, 245 (Tex.1981)).

The lessee's royalty obligations are determined from lease agreements executed prior to and wholly independent of gas purchase contracts. *Middleton*, 613 S.W.2d at 245. The royalties are fixed and unaffected by the gas contracts. *Id.* Furthermore, in basic contract terms, there is no privity between the lessor and the purchaser who contracts with the lessee. *See id.* (holding that market value for royalty purposes must be calculated without reference to the gas contract). As demonstrated by *Bruni I,* the royalty is typically based on production.

■■■■ Under the lessee's separate gas purchase agreement, the purchaser satisfies a take-or-pay provision by *either* purchasing a specified quantity of gas *or* paying the producer for the right to purchase that quantity of gas in the future. *The Lenape Resources Corp.*, 925 S.W.2d at 570. "Because of this alternative performance, the pay option under a take-or-pay contract is not a payment for the sale of gas. Rather, it is a payment for the exclusive dedication of reserves for a fixed period of time." *Id.* (citations omitted); *see also* Bruce M. Kramer, *Royalty Obligations Under the Gun—The Effect of Take–or–Pay Clauses on Duty to Make Royalty Payments,* 39 INST. ON OIL &

---

**5.** Even given the broad "net interest" language, this production requirement is consistent with the requirement that royalty be calculated after production, whether based on "market value" or "amount realized." *See Exxon Corp. v. Middleton*, 613 S.W.2d 240, 243 (Tex.1981).

**6.** For examples of such provisions, see John S. Lowe, *Defining the Royalty Obligation*, 49 S.M.U. L. REV. 223, 238 n. 98 (1996).

**7.** Commentators have also described *Bruni I* as a proceeds dispute. *See, e.g.*, Michael Pearson & Richard D. Watt, *To Share or Not to Share: Royalty Obligations Arising out of Take–or–Pay or Similar Gas Contract Litigation*, 42 INST. ON OIL & GAS L. & TAX'N §§ 14.03[2][d], 14.03[3][b][ii] (1991).

GAS L. & TAX'N § 5.02 (1988) (detailing several purposes). Thus, the pay option is "made when gas is *not produced,* and as such, bear[s] no royalty." *Bruni I,* 806 S.W.2d at 268; *see also Mandell v. Hamman Oil & Ref. Co.,* 822 S.W.2d 153, 164–65 (Tex. App.—Houston [1st Dist.] 1991, writ denied).

Finkelstein refers to language in *Bruni II* where we noted "cogent arguments concerning the royalty owner's interest in take-or-pay settlement funds, especially when, as here, the settlement terminates the purchaser's recoupment rights." *Hurd Enterprises, Ltd. v. Bruni,* 828 S.W.2d 101, 107–08 n. 8 (Tex.App.—San Antonio 1992, writ denied) (where recoupment issue not raised). Our footnote acknowledged that arguments favoring recovery of royalty were based on "[t]he legal issue [of] whether the non-recoupable take-or-pay payment is compensation for past and/or future gas production, or whether it represents payment for the producer having the gas available but not producing it, i.e., storing the gas for the purchaser's benefit." 828 S.W.2d at 108 n. 8. This legal issue has been resolved by *Lenape*'s explanation that take-or-pay payments represent compensation for producing and storing gas, not the mere "pre-payment" of gas suggested by Finkelstein. 925 S.W.2d at 571–72. For this reason, the dicta in *Bruni II* is not controlling.

For the same reason, the royalty owner, who does not "shoulder the . . . risks of exploration, production, and development," should not share in the take-or-pay payment. *Diamond Shamrock Exploration Co. v. Hodel,* 853 F.2d 1159, 1167 (5th Cir.1988); *see also Bruni II,* 828 S.W.2d at 110 (describing risks of lessor and lessee). Thus, Finkelstein cannot share in the right to the settlement proceeds without accepting corresponding duties.[8]

At the heart of Finkelstein's argument is his mischaracterization of the El Paso settlement as including both "take-or-pay damages" for gas "that was not produced" (of which he disclaims any interest) and "repudiation damages" for "the entire El Paso contract" (of which he claims an interest in that portion representing gas produced and sold on the spot market). El Paso's lump-sum settlement did not make this distinction, although the underlying case was tried to both the court and the jury, resulting in awards of $67 million and $536 million, respectively.

The former figure represents El Paso's payment for years in which it took less gas than the 80 percent of production required by the contract (1985 and 1986), and the latter figure represents El Paso's payment for years in which it took no gas at all (1987 through 1996). This conclusion is supported by jury question number 2, in which the jury found that El Paso breached its contract with TransAmerican "as a whole" by failing to make the prepayment due on January 10, 1987. Question number 6 asked the jury to calculate damages based on the difference between the contract price and the market price, which was defined as the price of gas when the contract was breached. In contrast, the trial court's findings of fact demonstrate that "take-or-pay damages" were based "on a deficiency." One amicus curiae suggested that the distinction was one of convenience because past production was readily ascertainable while future production was uncertain.[9] In short, a breach is a breach. Both awards represent nonproduction—gas not taken or paid for under the gas purchase agreement.

In this case, gas was produced and sold to third parties. El Paso did not take the gas; instead, it was required to pay TransAmerican for the dedication of the reserves. The El Paso settlement represents compromise of a dedication claim that existed independently of a lease, as did the settlement in *Bruni I,* even if TransAmerican allowed El Paso a "credit" for gas TransAmerican sold on the spot market. If TransAmerican's settlement with El Paso increased the price for gas produced, Finkelstein would receive two royalties on the same gas, a right to which he was not entitled under the terms of his lease.

---

8. As TransAmerican aptly queried, "For if prices had gone up instead of down, would Finkelstein want to share in our losses?"

9. On rehearing, we received amicus curiae briefs from James N. Castleberry, Jr., Edwin P. Horner, John S. Lowe, and Texas Mid–Continent Oil & Gas Association.

Therefore, the TransAmerican/El Paso settlement does not "have the effect of increasing the price paid for gas that was taken." *See Bruni I*, 806 S.W.2d at 268.

█ Take or pay is not a benefit which flows from the marketing covenant of a lease. *See Mandell*, 822 S.W.2d at 165. We therefore hold, as a matter of law, that TransAmerican was required to obtain for Finkelstein benefits related to the sale of gas that was produced and sold on the spot market—gas which, by definition, was not included in El Paso's take-or-pay settlement. We hold that TransAmerican was not required to share the proceeds of its take-or-pay settlement with Finkelstein. By these holdings, we reaffirm our decision in *Bruni I* and clarify that a royalty owner, absent specific lease language, is not entitled to take-or-pay settlement proceeds, whether or not gas is sold to third parties on the spot market.

Because we find no breach of the duty to reasonably market, we sustain TransAmerican's points of error 2–A and 2–B. We therefore find it unnecessary to address its complaints embodied in points of error 2–C and 2–D that legally and factually insufficient evidence supports the damage award for breach of the marketing duty.

### Unjust Enrichment

█ In points of error 1–A and 1–B, TransAmerican argues that the trial court erred in rendering judgment against TransAmerican on the jury's finding that TransAmerican was unjustly enriched "because there is no unfairness in holding Finkelstein to his bargain," that is, the lease agreement.

█ Unjust enrichment characterizes the result of failing to make restitution for benefits received under circumstances giving rise to an implied or quasi-contract. *Allen v. Berrey*, 645 S.W.2d 550, 553 (Tex.App.—San Antonio 1982, writ ref'd n.r.e.). There can be no recovery "if the same subject is covered by an express contract." *Lone Star Steel Co. v. Scott*, 759 S.W.2d 144, 154 (Tex.App.—Texarkana 1988, writ denied); *see also Angelo Broadcasting, Inc. v. Satellite Music Network, Inc.*, 836 S.W.2d 726, 731 (Tex.App.—Dallas 1992, writ denied); *Allen*, 645 S.W.2d

at 553. We believe this result is particularly appropriate when sophisticated parties, like Finkelstein and TransAmerican, bargain for express contracts. *See Mandell*, 822 S.W.2d at 160.

We hold that, when Finkelstein entered into his lease with TransAmerican, he agreed to its express terms, and we hold that he was bound by his bargain. Recovery on an equitable theory would, as a matter of law, be inconsistent. *See Allen*, 645 S.W.2d at 555.

We sustain TransAmerican's points of error 1–A and 1–B. Accordingly, we decline to address points of error 1–C and 1–D regarding the sufficiency of the evidence supporting the damage award for unjust enrichment.

### Attorney's Fees

Because we sustain portions of TransAmerican's first and second points of error, the fourth point of error concerning Finkelstein's recovery of attorney's fees is necessarily sustained as well. *See Angelo Broadcasting*, 836 S.W.2d at 736; *Bruni II*, 828 S.W.2d at 112.

### Conclusion

We reverse the trial court's judgment and render judgment that Finkelstein take nothing from his claim against TransAmerican.

DUNCAN, J., dissents, joined by RICKHOFF and GREEN, JJ.

DUNCAN, Justice, dissenting.

Because the majority opinion refuses to confront the facts, and incorrectly resolves the issues, presented in this appeal, we dissent. We would affirm the trial court's judgment, as set forth in the original panel opinion, which we now append as our dissent.

### APPENDIX—PANEL OPINION

In *Bruni I* this court held that a royalty owner is not entitled to "royalties on the settlement proceeds arising from the take-or-pay provision" in a gas purchase contract. *Killam Oil Co. v. Bruni*, 806 S.W.2d 264, 268 (Tex.App.—San Antonio 1991, writ denied). Appellants, TransAmerican Natural Gas Corporation and TransTexas Gas Corporation

(collectively, TransAmerican), ask that we extend *Bruni I* to settlement proceeds covering repudiation damages based in part upon the royalty owner's gas and attributable to a period in which gas was actually produced and sold on the spot market. For the reasons discussed below, we decline TransAmerican's request and affirm the judgment.

### FACTS

The trial testimony and parties' written agreements, viewed in the light most favorable to the jury's verdict, tell the following story.

Hub Finkelstein, a successful independent oil producer in Texas, was approached in late 1972 or early 1973 by John R. Stanley, a Massachusetts businessman involved in refining and marketing oil and gas under the name of Good Hope Refineries. At the time, Stanley did not own any oil or gas interests. He wanted to invest $10 million in oil and gas drilling and operations, however, and asked Finkelstein to help him put together suitable properties. Finkelstein agreed to call if he found the kind of investment opportunity Stanley desired.

### 1973 Oral Agreement

In mid–1973, Finkelstein found what Stanley was looking for—the Lobo Trend, the largest undeveloped natural gas deposit discovered in Texas (and perhaps the United States) in the previous twenty years. At Stanley's request, Finkelstein flew to New Orleans for a meeting. The two men made a handshake deal at the New Orleans airport— in exchange for a 25% net interest in each well drilled, Finkelstein would obtain leases in Webb and Zapata Counties in Good Hope's name, determine where the wells were to be drilled, and, since only Finkelstein was licensed as an operator in Texas, permit the wells and contract for drilling. Stanley would put up the needed monies.

### 1974 Agreement

Despite Finkelstein's repeated requests, Stanley failed to reduce their handshake deal to writing. Nonetheless, in accordance with their 1973 Oral Agreement, Finkelstein worked to obtain leases for Good Hope, and he shared his geological data and knowledge with Stanley. By early 1974 Finkelstein had put together more than 100,000 acres of leases. Finally, on January 24, 1974, a written agreement was signed. The 1974 Agreement did not, however, reflect the oral 75/25 partnership arrangement. Instead, in exchange for a right of first refusal on all interests found by Finkelstein in Webb and Zapata Counties, Stanley agreed "that whenever he accept[ed] a trade submitted to him by Finkelstein ..., he [would] assign to Finkelstein an overriding royalty interest equivalent to 1/16 of the net revenue interest acquired by Stanley...."

Stanley took every deal Finkelstein offered him. Still Stanley failed to comply with his promise in the 1974 Agreement to assign the required royalty interests to Finkelstein "promptly after Stanley's interest [was] acquired." To settle their dispute, the two men supplemented the 1974 Agreement. By this time, however, Stanley no longer needed Finkelstein because Good Hope had already acquired Finkelstein's geological data, as well as his engineers and lease brokers. As a result, while Finkelstein received an "overriding royalty interest in the oil, gas and other minerals produced, saved and marketed from the lands covered by and described in [certain leases]," the supplement to the 1974 Agreement restricted Finkelstein's royalty interests to a geographic area smaller than Webb and Zapata Counties and required him to sell his gas to Good Hope under a gas purchase agreement.

### 1975 Farmout Agreement

Attached as an exhibit to the 1974 Agreement was a list of the deals Finkelstein had offered to Stanley but which had not closed. Included on this list were deals covering the minerals underlying the 20,000–acre La Perla Ranch, which Finkelstein was actively working to acquire from El Paso Natural Gas.[1]

---

**1.** El Paso owned 56.25% of the minerals underlying 17,000 acres, and 50% of the minerals under-lying the remaining 3,000 acres, of the La Perla Ranch.

These efforts reached fruition on March 18, 1975 when El Paso and Good Hope entered into a farmout agreement. In exchange for transferring its mineral interests to Good Hope, El Paso received, among other consideration, a preferential right to purchase. As a result of the 1975 Farmout Agreement and his previous agreements with Stanley, Finkelstein owned a 1/16th overriding royalty interest in Good Hope's net revenue interest in the La Perla Ranch minerals, subject to El Paso's preferential purchase right.

### Good Hope's "Halloween" Bankruptcy

Stanley failed to make the assignments required by the 1974 Agreement and supplement. Accordingly, when Good Hope filed for bankruptcy on October 31, 1975, Finkelstein was forced to file and later settle an adversary claim for the assignments he had not received. In 1980 Good Hope emerged from bankruptcy as GHR Energy.

### EPNG Gas Purchase Agreement

In February 1981, El Paso exercised its preferential right to purchase the gas underlying La Perla Ranch and entered into a long-term gas purchase agreement with GHR. Under the EPNG Gas Purchase Agreement, GHR dedicated its entire interest in the La Perla Ranch gas, including Finkelstein's royalty interest, to El Paso. In exchange, El Paso agreed that it would take or, if it did not take, pay for 80% of the La Perla production for a fifteen-year term. With respect to gas paid for but not taken, El Paso received a five-year make-up right.

### GHR 1983 Bankruptcy

In January 1983, GHR again sought the protection of the bankruptcy court. And, once again, to hold Stanley to his previous agreements, Finkelstein was forced to file adversary claims. These adversary claims could be roughly grouped into four categories: (1) Finkelstein's claim to a royalty interest in the La Perla Ranch minerals, which GHR was denying; (2) underpayment and nonpayment of accrued royalties; (3) a $103 million claim arising out of GHR's rejection of its gas purchase agreement with Finkel-

stein; and (4) the failure to make all of the assignments required by the 1974 Agreement and supplement. Sometime during its second bankruptcy, GHR became known as TransAmerican, and it will be referred to by that name henceforth.

### El Paso Litigation

During the pendency of TransAmerican's bankruptcy, El Paso filed a declaratory judgment action seeking to avoid the take-or-pay provision in the EPNG Gas Purchase Agreement. TransAmerican counterclaimed for various breaches of contract. One of the breaches alleged was El Paso's underpayment for gas produced and delivered to El Paso before 1985 (the Pre–1985 Withheld claim). Another, more monetarily significant breach was El Paso's breach of the take-or-pay provision.

In a 1986 partial summary judgment, the trial court ruled that El Paso was bound by the take-or-provision; and, by August 1987, TransAmerican had amended its petition to allege that El Paso had repudiated the EPNG Gas Purchase Agreement in January 1987. Accordingly, the two largest elements of damages TransAmerican sought were (1) take-or-pay damages for breaches of the take-or-pay provision for the years 1985 and 1986 and (2) repudiation damages for the remainder of the contract term, that is, 1987 through 1996. TransAmerican's claimed repudiation damages included damages for Finkelstein's gas. Trial on the take-or-pay damages was set for a bench trial on September 1, 1987; trial of the repudiation claim was set for a jury trial on September 18, 1987.

### 1987 Settlement Agreement

On April 23, 1987, Finkelstein's adversary claims in TransAmerican's bankruptcy proceeding were settled. The 1987 Settlement Agreement provided:

(1) Stanley and TransAmerican confirmed Finkelstein's "overriding royalty interest equal to one-sixteenth (1/16th) of the net revenue interest earned, acquired or otherwise received, and to be earned, acquired or otherwise received

by" TransAmerican under the 1975 Farmout Agreement.

(2) TransAmerican agreed to pay Finkelstein accrued and unpaid overriding royalties of $2,611,762, a sum comprised of the following amounts and related to the following claims: (a) "$74,000, which includes payments accruing on production from March and April of 1987"; (b) $367,000, which was "due under Adversary Proceeding No. 85–0946–H2–5 if [TransAmerican] prevail[s] in [its] suit against El Paso Natural Gas for gas sold and delivered," payment of which was contingent upon TransAmerican prevailing on this claim in the El Paso Litigation; and (c) $2,170,762, representing the balance of the accrued but unpaid royalties, payment of which was to be made in installments over a three-year period.

(3) Finkelstein received an additional 1½% overriding royalty interest equal to a .015 "net revenue interest" in TransAmerican's lease interests in and certain agreements relating to the La Perla Ranch minerals.

(4) Finkelstein received the other assignments of overriding royalty interests due him under the parties' agreements.

The 1987 Settlement Agreement further provided that "[a]ll amounts due to [Finkelstein] after the date of this agreement shall be paid in the ordinary course." Finally, the agreement specifically provided that "[i]t is expressly agreed by [TransAmerican and Finkelstein] that the Assignment of Overriding Royalty Interest attached hereto shall not reduce, diminish or impair in any way the Prior Overriding Royalty Interests or the overriding royalty interests assigned and conveyed to [Finkelstein] pursuant to the Assignments of Overriding Royalty Interests...."

### Judgment and Settlement in the El Paso Litigation

In August 1987, Finkelstein sought to intervene in the El Paso Litigation. TransAmerican objected to Finkelstein's intervention, however, and the trial court struck Finkelstein's plea. At the time, TransAmerican assured Finkelstein that it would protect his interests.

In September 1987, the trial court ruled that TransAmerican's take-or-pay damages for the years 1985 and 1986 were approximately $67 million. Thereafter, the jury found that TransAmerican's repudiation damages for the remainder of the contract term were approximately $536 million. The jury's finding for repudiation damages corresponded exactly with the calculations of TransAmerican's expert, Dr. Leitzinger, and represented the present value of the difference between the EPNG Gas Purchase Agreement price and the February 1987 spot market price for TransAmerican and Finkelstein's anticipated production. TransAmerican's damages for El Paso's other breaches, including the Pre–1985 Withheld claim, totaled over $5 million. The trial court rendered judgment in accordance with its findings, as well as those of the jury, for $621,127,599.50, together with attorney's fees, postjudgment interest, and costs.

Shortly after judgment in the El Paso Litigation, the U.S. Supreme Court handed down its decision in *Federal Energy Regulatory Commission v. Martin Exploration Management Co.,* 486 U.S. 204, 108 S.Ct. 1765, 100 L.Ed.2d 238 (1988). The parties and the trial court interpreted *Martin* as affecting the maximum lawful price TransAmerican could charge El Paso for certain gas; as a result, TransAmerican agreed to a remittitur of $140,800,215.76. This remittitur, which was specifically allocated by TransAmerican to the various elements of its damages, reduced TransAmerican's take-or-pay damages, together with prejudgment interest, to $64,324,467.84; TransAmerican's repudiation damages were reduced to $412,451,582. After the remittitur, the judgment rendered against El Paso totaled $480,309,341.34, together with attorney's fees, costs, and postjudgment interest.

Not surprisingly, El Paso appealed. Concerned about its chances, however, El Paso also approached Stanley to settle the case. After brief negotiations, a settlement agreement was reached. Under the El Paso Settlement, which was effective January 1, 1990:

(1) the EPNG Gas Purchase Agreement, the 1975 Farmout Agreement, and all other agreements between El Paso and Trans-American were canceled; (2) El Paso paid TransAmerican $302 million in cash; and (3) El Paso conveyed to TransAmerican its entire interest in the La Perla Ranch minerals, which TransAmerican valued on its books at $58 million. In exchange TransAmerican released not only its own claims but also the claims of its "assigns." In this manner, the El Paso Settlement "washed out" or terminated Finkelstein's interest in the La Perla Ranch minerals. *See Medallion Oil Co. v. TransAmerican Natural Gas Corp. (In re GHR Energy Corp.),* 972 F.2d 96 (5th Cir. 1992), *cert. denied,* 507 U.S. 1042, 113 S.Ct. 1879, 123 L.Ed.2d 497 (1993).

### *Finkelstein v. TransAmerican*

After TransAmerican refused to pay Finkelstein any part of the El Paso Settlement, Finkelstein sued TransAmerican for unjust enrichment and breach of its duty to reasonably market. Finkelstein sought to recover his royalty interest on the amount paid by El Paso to settle TransAmerican's repudiation claim and allocable to his overriding royalty interest for the period October 1, 1987 through December 31, 1989.[2] In light of this court's decision in *Bruni I,* Finkelstein has expressly and repeatedly disclaimed any interest in TransAmerican's take-or-pay damages. TransAmerican, on the other hand, has consistently maintained that *Bruni I* precludes any recovery by Finkelstein under any theory.

The trial court rejected TransAmerican's arguments and submitted the case to the jury on Finkelstein's marketing and unjust enrichment theories. The jury returned a verdict in Finkelstein's favor on both theo-

ries, and the trial court rendered judgment on the jury's verdict. TransAmerican appealed.

### TRANSAMERICAN'S AFFIRMATIVE DEFENSES

In its third point of error, TransAmerican argues that Finkelstein's claim is barred by the accord and satisfaction reflected in the 1987 Settlement Agreement and by res judicata. Since these arguments, if successful, would be dispositive of this appeal, we consider them first.

### *Accord and Satisfaction*

In Points of Error 3–A and 3–B, TransAmerican argues that, as a matter of law and the undisputed facts, Finkelstein's claim is barred by accord and satisfaction. Alternatively, TransAmerican argues that the jury's contrary finding is against the great weight and preponderance of the evidence. We review TransAmerican's sufficiency complaints here and elsewhere in this opinion under the well-established rules for measuring the legal and factual sufficiency of the evidence. *See* Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error,* 38 TEXAS L. REV. 361, 362–68 (1960).[3]

The affirmative defense of accord and satisfaction "rests upon a new contract, express or implied, in which the parties agree to the discharge of the existing obligation by means of the lesser payment tendered and accepted." *Jenkins v. Henry C. Beck Co.,* 449 S.W.2d 454, 455 (Tex.1969). To prove that a particular agreement rises to the level of an accord and satisfaction, "the evidence must establish an assent of the parties to an agreement that the amount paid by the debtor to the creditor was in full satisfaction of the entire claim." *Id.* The evidence in this case falls far short of establishing such an agreement and, in fact, establishes the contrary.

---

**2.** October 1, 1987 was the date on which TransAmerican again began paying royalty to Finkelstein "in the ordinary course" under the 1987 Settlement Agreement. December 31, 1989 was the last day Finkelstein owned a royalty interest in the La Perla Ranch minerals.

**3.** We recognize TransAmerican's attempt to characterize the accord and satisfaction issue as a question of law, which would be reviewed de

novo. *See* TransAmerican's Opening Brief at 36 ("[T]he parties do not appear to be in any meaningful disagreement over the underlying facts. The only disagreement is over the law."). But the parties' briefs and the nature of the question conclusively establish that the parties' disagreement in this respect is over the interpretation of the 1987 Settlement Agreement, not a disagreement over the law of accord and satisfaction.

TransAmerican's claim preclusion arguments rest upon the following sentence in the 1987 Settlement Agreement:

> Another $367,000 is due under Adversary Proceeding No. 85–0946–H2–5 if the Debtors prevail in their suit against El Paso Natural Gas for gas sold and delivered, and shall be paid to [Finkelstein] upon receipt by the Debtors of satisfaction of such an award from El Paso.

Plucking this sentence out of context—and disregarding the phrase "sold and delivered"—lends at least some credence to TransAmerican's accord and satisfaction argument. However, when read in context, the plain and unambiguous terms of the 1987 Settlement Agreement establish that the monetary aspects of the agreement settled only Finkelstein's claims for royalties that accrued and were unpaid prior to April 1987; they did not purport to settle Finkelstein's claim to royalties that accrued during the period here at issue, *i.e.*, October 1, 1987 through December 31, 1989. As further explained by Finkelstein and his expert witness, Donato Ramos, the $367,000 paid to settle Adversary Proceeding No. 85–0946–H2–5 reflected the settlement of Finkelstein's claim against TransAmerican for his royalty share of the Pre–1985 Withheld claim asserted by TransAmerican against El Paso. *See Finkelstein v. TransAmerican Natural Gas Corp. (In re TransAmerican Natural Gas Corp.)*, 127 B.R. 800, 803 (S.D.Tex.1991) (TransAmerican's "contention" is "erroneous. The $367,000 was for gas previously produced from La Perla and for which royalties were owing. The 1987 settlement did not involve royalties to future production.").[4]

The only evidence that supports any accord and satisfaction argument came from Craig Shephard, TransAmerican's former President and Chief Operating Officer. Shephard testified that Finkelstein settled his claim in this litigation when he accepted the additional 1½% overriding royalty in the 1987

Settlement Agreement and released his claims against TransAmerican. Finkelstein, on the other hand, testified that he received the additional 1½% overriding royalty to settle his claim arising out of TransAmerican's rejection of his gas purchase agreement, and nothing in the 1987 Settlement Agreement was intended to settle his claim to a royalty interest in TransAmerican's repudiation damages. In light of this conflicting testimony, the trial court erred on the side of caution and submitted this issue to the jury. The jury found that Finkelstein did not "accept the benefits of the Settlement of April 23, 1987, in satisfaction of all claims he would have arising out of the controversy between El Paso and TransAmerican." The jury's answer is amply supported by the unambiguous terms of the 1987 Settlement Agreement and the evidence. TransAmerican's Points of Error 3–A and 3–B are therefore overruled.

### *Res Judicata and 11 U.S.C. § 1141*

TransAmerican next argues under Points of Error 3–C and 3–D that Finkelstein's claim is barred by res judicata, specifically section 1141 of the Bankruptcy Code. According to TransAmerican, section 1141 bars "all issues that could have been raised in connection with ... confirmation" of a plan of reorganization. Finkelstein counters that his claim is not barred because it arose after the date TransAmerican's reorganization plan was confirmed.

The res judicata effect of a judgment rendered by a federal court is governed by federal res judicata law. *E.g., Eagle Properties, Ltd. v. Scharbauer*, 807 S.W.2d 714, 718 (Tex.1990). For bankruptcy plan confirmations, the federal law of res judicata is contained in section 1141 of the Bankruptcy Code. Section 1141(d)(1)(A) provides in pertinent part that "the confirmation of a plan ... discharges the debtor from any debt that arose before the date of such confirmation." 11 U.S.C. § 1141(d)(1)(A) (West 1993).

---

4. Citing *Thermtron Products, Inc. v. Hermansdorfer*, 423 U.S. 336, 352–53, 96 S.Ct. 584, 594, 46 L.Ed.2d 542, 555 (1976), and *Missouri Pac. R.R. v. Brown*, 862 S.W.2d 636, 639 (Tex.App.—Tyler 1993, writ denied), TransAmerican argues that the federal district court's remand order does not preclude its accord and satisfaction argument because the order is neither final nor appealable. We do not decide this issue because the evidence in this case establishes the factual inaccuracy of TransAmerican's position.

The bankruptcy court confirmed Trans-American's plan of reorganization on September 4, 1987. *In re TransAmerican Natural Gas Corp.*, 127 B.R. at 802. Finkelstein's claim in this litigation arose out of gas produced and sold between October 1, 1987 and December 31, 1989 and settlement monies paid to TransAmerican in early 1990. We therefore agree with the conclusion of the federal district court that Finkelstein's claim arose after the date of confirmation and is not, therefore, barred by section 1141. *See id.* at 803. TransAmerican's Points of Error 3–C and 3–D are overruled.

## BREACH OF DUTY TO MARKET

In Points of Error 2–A and 2–B, TransAmerican argues that, as a matter of law and the weight of the evidence, the trial court erred in rendering judgment against TransAmerican on the jury's finding that TransAmerican breached its duty to reasonably market Finkelstein's gas "because an overriding royalty interest owner is not entitled to share in the proceeds from a take-or-pay settlement." Because these points of error are dispositive of the liability aspect of this appeal, we consider them next.

To explain the nature of the parties' disagreement, we believe it is instructive to first detail the extent to which the parties agree on the relevant law and the material facts. First, as to the relevant law, the parties agree that actual production triggers a duty to reasonably market. *Cabot Corp. v. Brown*, 754 S.W.2d 104, 106 (Tex.1987). The parties also agree that the duty to reasonably

market includes a duty to "obtain the best price reasonably possible." *Id.* Finally, TransAmerican's former President and Chief Operating Officer, Craig Shephard, agreed that one aspect of TransAmerican's duty to obtain the best price required it to compute Finkelstein's overriding royalty on the sale proceeds actually received by TransAmerican; TransAmerican could not sell Finkelstein's gas for $3 and compute his royalty on $2. If TransAmerican breached this aspect of its duty to market, Shephard conceded that Finkelstein would be entitled to sue and collect the withheld portion.[5]

The material facts are likewise undisputed. TransAmerican's repudiation damages in the El Paso Litigation were based upon anticipated production from the date of repudiation through the expiration of the EPNG Gas Purchase Agreement in 1996, and this anticipated production included Finkelstein's gas. It is also undisputed that, between October 1, 1987 and December 31, 1989, TransAmerican actually produced and sold to third parties, at the spot market price, 84 billion cubic feet of gas from the La Perla Ranch.

The point at which the parties diverge is whether repudiation damages, when based upon anticipated production that includes the royalty owner's gas, increase the price paid for gas actually produced and sold on the spot market during the period of repudiation and, if so, whether Finkelstein is entitled to a royalty on the increase. TransAmerican argues that *Bruni I* is dispositive of both issues and precludes Finkelstein's claim. Finkelstein, on the other hand, argues that *Bruni I* is distinguishable. To resolve this disagree-

**5.** In this respect, it should be remembered that the 1974 Agreement, as well as the 1987 Settlement Agreement, provided that Finkelstein's overriding royalty interests were fractional parts of TransAmerican's "net revenue interest." The terms of the additional 1½% overriding royalty Finkelstein received in the 1987 Settlement Agreement went even further; Finkelstein received a royalty interest not only in the gas "produced and saved from or attributed to" TransAmerican's interests but also on "all (i) gas leases, oil and gas leases, oil, gas and mineral leases ..., (ii) development agreements, joint development agreements, farmout agreements, farmin agreements, contracts to lease, net revenue interest agreements, and, without exception, all

other agreements which have as their purpose or will involve or be concerned with the exploration, drilling and/or production of oil, gas and/or other minerals ... and (iii) all other interests in land, including, but not limited to, fee mineral interests, royalty interests, overriding royalty interests, net profits interests, production payments and other similar interests in production of oil, gas and/or other minerals...." The terms of these royalty instruments govern TransAmerican's duty to reasonably market. *See Amoco Prod. Co. v. First Baptist Church of Pyote*, 579 S.W.2d 280 (Tex.Civ.App.—El Paso 1979), *writ ref'd n.r.e. per curiam*, 611 S.W.2d 610 (Tex.1980) (distinguishing "market value" and "proceeds" royalty provisions).

ment, we must first consider the extent of the holding in *Bruni I*.

### Bruni I

The facts in *Bruni I* are relatively straightforward. The Bruni Mineral Trust entered into an oil and gas lease with Killam and Hurd, who entered into a take-or-pay gas purchase agreement with United Texas Transmission Company. *Bruni I*, 806 S.W.2d at 265. United Texas breached its take-or-pay obligation, and Killam sued. *Id.* Killam's suit was settled for $4 million. *Id.* Hurd, without filing a lawsuit, settled his take-or-pay claim against United Texas for $2.8 million. *Id.* The Trust sued Killam and Hurd for a share of the settlement proceeds on theories of breach of the duty to market, breach of the duty of good faith and fair dealing, conversion, fraud, royalty, unjust enrichment, and equitable reformation. *Id.* Faced with competing motions for summary judgment, the trial court granted the Trust's motion on, and severed, its royalty claim, thus enabling an appeal. *See id.* at 265–266, 266 n. 2.

This court reversed, holding "as a matter of law, that the Trust is not entitled to royalties on the settlement proceeds arising from the take-or-pay provision of the contract between Killam, Hurd, and [United Texas]." *Id.* at 268. The basis for this holding was *Exxon Corp. v. Middleton*, 613 S.W.2d 240, 244 (Tex.1981), which defined "production" as "actual physical extraction of the mineral from the land." The court reasoned that the Trust's "lease entitled the Trust to royalty payments on gas actually *produced.*" *Id.* at 267 (emphasis in original). Accordingly, since take-or-pay "payments are made when gas is *not produced,*" they "bear

no royalty." *Id.* at 268 (emphasis in original).

The court observed that the Trust's suit was not based on gas sold by Killam and Hurd on the spot market. *Id.* at 267. It would appear, therefore, that this court's holding in *Bruni I* is limited to a royalty owner's suit for take-or-pay payments based upon non-production. In this respect, however, the opinion appears to be at odds with itself because the court also recognized that "[t]he Trust contends the settlement payments received by Killam and Hurd from [United Texas] might have included underpayment for gas sold on the spot market." *Id.* That is precisely Finkelstein's argument in this case; he seeks to recover for what he views as TransAmerican's underpayment for gas produced and sold on the spot market in light of the El Paso Settlement.

To resolve the apparent conflict in *Bruni I*, we read the opinion as a whole, and in light of the court's later opinion in *Bruni II*, which indicates that the nonrecoupable payment argument was not presented in *Bruni I*. *See Hurd Enterprises, Ltd. v. Bruni*, 828 S.W.2d 101, 107–08 n. 8 (Tex.App.—San Antonio 1992, writ denied) (recognizing "cogent arguments concerning the royalty owner's interest in take-or-pay settlement funds, especially when, as here, the settlement terminates the purchaser's recoupment rights" but noting that "[t]he recoupment issue ... was not submitted in the case before us").[6] Considering these factors, we agree with TransAmerican that "[p]roduction is key"; *Bruni I* "turn[s] on ... production." We therefore hold that *Bruni I* does not control in this case, in which the fact of production is undisputed and the nonrecoupable payment argument is squarely presented.[7]

---

**6.** In light of the importance of this issue, we have also reviewed the briefs in *Bruni I*. In our view, while the issue of nonrecoupable payments was raised in the Trust's brief, it was eclipsed by Killam and the amici's forceful arguments in reply, including that the trial court's summary judgment ruling was based upon a pure take-or-pay payment, divorced from any production. Indeed, the thrust of Killam and the amici's briefs was the recoupable nature of pure take-or-pay payments. As stated in TransAmerican's amicus brief in *Bruni I*: "Royalty owners are not hurt by a take-or-pay settlement. They still own the gas and will receive their royalty when that gas is

eventually produced and sold—just as provided in the lease agreement." We therefore adhere to the court's statement in *Bruni II* that the recoupment issue was not raised in the *Bruni* cases.

**7.** We also do not believe the other cases relied upon by TransAmerican are dispositive. In *Middleton*, the issue was whether a sale that was in the field but not on the leased premises was a sale "off premises" such that royalty was to be calculated on the market value of the gas, rather than the amount realized. *Middleton*, 613 S.W.2d at 242. The issue in *Monsanto Co. v.*

### Royalty on Repudiation Damages

Finkelstein distinguishes *Bruni I* and the rule of law upon which it rests by the nature of the damages sought—while the Bruni Mineral Trust sought a share of historical take-or-pay damages for which there was no production, Finkelstein seeks a share of TransAmerican's repudiation damages attributable to a period in which there was actual production. In its reply brief, TransAmerican argues that this is a distinction without a difference because it rests upon the fortuitous fact of whether the seller files suit each year for the take-or-pay damages arising out of the breach of the take-or-pay provision the preceding year or, alternatively, sues for accrued take-or-pay damages and anticipatory repudiation of the take-or-pay contract. In either case, TransAmerican argues, the damages are take-or-pay damages, in which the royalty owner may not share under *Bruni I*.

We agree with TransAmerican that the amount of take-or-pay damages and repudiation damages will vary depending upon the date of repudiation. If, for instance, El Paso had not repudiated the EPNG Gas Purchase Agreement until 1990, TransAmerican's take-or-pay damages would have been greater, while its repudiation damages would have been less, than they in fact were. We disagree, however, that the distinction is immaterial. We believe instead that it is Trans-American's argument that rests upon a flawed premise, *i.e.*, there is no material distinction between take-or-pay and repudiation, and recoupable and nonrecoupable, payments.

As explained by Finkelstein's damages expert, Ricardo Garza, there is a significant factual distinction between take-or-pay and repudiation damages—take-or-pay damages are based solely upon the contract price, while repudiation damages are based upon the difference between the contract price and the spot market price. This factual difference highlights what we believe is the critical legal distinction between take-or-pay and repudiation damages.

When a buyer breaches its take-or-pay obligation and compensates for its breach with take-or-pay damages, the gas remains committed to the contract and stays in the ground. *Bruni I*, 806 S.W.2d at 268. A royalty interest dependent upon production is therefore not owed at the time the take-or-pay payment is made. *See id.* Rather, royalty is owed when the buyer actually takes the gas pursuant to its contractual make up right, and its account is credited with the corresponding amount of the take-or-pay damages. *See id.*[8] But if the buyer repudiates the contract, and the seller mitigates its damages by producing and selling gas to third parties at the spot market price, the gas is gone. If royalty is not owed on the seller's repudiation damages, the royalty owner will never recover royalty on the price effectively received for the gas produced and sold on the spot market during the period of repudiation. Repudiation damages are thus in the nature of a nonrecoupable "buyout." Therefore, if a royalty owner is to receive a royalty on the full price effectively paid for the gas produced and sold during the repudiation period, the royalty must be calculated

---

*Tyrrell*, 537 S.W.2d 135, 136 (Tex.Civ.App.—Houston [14th Dist.] 1976, writ ref'd n.r.e.), was whether an advance payment for future production was "recovery from production." The court held that it was not because, at the time the payment was made, there had been no actual production. *Id.* at 137; *see also Mandell v. Hamman Oil & Ref. Co.*, 822 S.W.2d 153, 165 (Tex. App.—Houston [1st Dist.] 1991, writ denied) ("A take or pay payment that comes before gas is actually produced and taken cannot be a payment for the sale of gas."). In this case, on the other hand, it is undisputed that the payment came after actual production and sale on the spot market, and that actual production represented some part of the anticipated production upon which the payment was based.

**8.** TransAmerican correctly notes that *Bruni I* followed the majority rule that a royalty owner is not entitled to a royalty on take-or-pay damages until the gas is actually taken. *See, e.g., Diamond Shamrock Exploration Co. v. Hodel*, 853 F.2d 1159, 1166–67 (5th Cir.1988) (applying federal law); *Mandell*, 822 S.W.2d at 165; *State v. Pennzoil Co.*, 752 P.2d 975, 979–80 (Wyo.1988); *but see Frey v. Amoco Prod. Co.*, 603 So.2d 166, 180–81 (La.1992) (under Louisiana law, and in light of royalty provision there at issue, royalty due on both recoupable and nonrecoupable take-or-pay payments).

not only on the spot market price but also to some extent on the repudiation damages. *Cf. Klein v. Jones,* 980 F.2d 521, 531–32 (8th Cir.1992), *appeal after remand sub nom. Klein v. Arkoma Prod. Co.,* 73 F.3d 779, 787–88 (8th Cir.1996) (applying Arkansas law); *Frey v. Amoco Prod. Co.,* 603 So.2d 166, 179 (La.1992); *see also* ERNEST E. SMITH & JACQUELINE LANGE WEAVER, 1 TEXAS LAW OF OIL AND GAS § 4.6(E)(6)(b), at 215–1 to 215–4 (1995) (noting that several commentators distinguish settlements from routine take-or-pay payments); Jerome C. Muys et al., *Report of the Committee on Public Lands,* 15 ENERGY L.J. 219, 230 (1994) (describing tentative conclusions of Minerals Management Service regarding portions of gas contract settlements payable as royalty); Kirk J. Bily, Comment, *Royalty on Take–or–Pay Payments and Related Consideration Accruing to Producers,* 27 HOUS. L. REV. 105, 132–35 (1990) (claiming that lost royalty is unfair and urging courts to distinguish nonrecoupable settlements from take-or-pay payments).

We recognize that the federal courts disagree on whether nonrecoupable settlements are "gross proceeds" such that they bear royalty under federal regulations. *Compare Independent Petroleum Ass'n v. Babbitt,* Civ. A. Nos. 93–2544(RCL) & 94–2123(RCL), 1995 WL 431305, slip op. at *9–11 (D.D.C. June 14, 1995) *with In re Century Offshore Mgt. Corp.,* 185 B.R. 734, 740 (E.D.Ky.1995). In the circumstances presented, however, we believe that, once El Paso's make-up right was terminated by cancellation of the EPNG Gas Purchase Agreement, the settlement proceeds relating to TransAmerican's repudiation damages "had the practical effect of increasing the price paid for gas actually produced." Ernest E. Smith, *Royalty Issues: Take–or–Pay Claims and Division Orders,* 24 TULSA L.J. 509, 518 (1989). This is particularly true in this case since Finkelstein's gas was included in TransAmerican's repudiation damages. "To give that amount to [TransAmerican] would let [it] benefit from a quantity of gas for which [it] was an agent." Ernest E. Smith, *Relationship Between Co–Owners in Marketing Natural Gas,* 1987 INST. ON NATURAL GAS MKTG. 11–8 (Rocky Mountain Mineral Law Foundation).

For the reasons discussed above, we believe TransAmerican effectively received two prices for the gas produced and sold during the period October 1, 1987 and December 31, 1989, but it paid Finkelstein royalty on only one of these prices. First, TransAmerican received the spot market price for the gas actually produced during this time period. As to this price, Finkelstein received his royalty interest. Second, in its settlement with El Paso, TransAmerican received some portion of the difference between the contract price and the spot market price on the gas it anticipated it would produce during this same time period. But as to this price, TransAmerican did not pay Finkelstein royalty. Accordingly, we agree with Finkelstein that "[t]his action amounts to TransAmerican obtaining the best price for its gas, but not obtaining the best price for Finkelstein's gas." We therefore hold that the applicable law and evidence supports the jury's finding that TransAmerican breached its duty to reasonably market Finkelstein's gas by obtaining a better price for its gas than it obtained for Finkelstein's. *See* Bruce M. Kramer, *Royalty Obligations Under the Gun—The Effect of Take–or–Pay Clauses on the Duty to Make Royalty Payments,* 39 INST. ON OIL & GAS L. & TAX'N § 5.06, at 5–30 to 5–33 (1988); John S. Lowe, *Current Lease and Royalty Problems in the Gas Industry,* 23 TULSA L.J. 547, 563 (1988) (both relying upon *Amoco Production Co. v. First Baptist Church of Pyote,* 579 S.W.2d 280 (Tex.Civ. App.—El Paso 1979), *writ ref'd n.r.e. per curiam,* 611 S.W.2d 610 (Tex.1980)).

Contrary to TransAmerican's "settled jurisprudence" and policy arguments, our holding resolves an issue not previously decided by this court; it effectuates the terms of the parties' agreements, which provide for royalties on TransAmerican's "net revenue interest"; it gives meaning to TransAmerican's duties to obtain the best price and pay royalty on the price actually obtained; and it is consistent with our decision in *Bruni I* and in line with dicta in *Bruni II,* as well as the views expressed by several courts and commentators regarding nonrecoupable take-or-

pay settlements. Accordingly, we overrule TransAmerican's Points of Error 2–A and 2–B.

### Damages

In Points of Error 2–C and 2–D, TransAmerican complains that the jury's damages finding is not supported by legally and factually sufficient evidence. In its argument, however, TransAmerican does no more than suggest that Finkelstein's damages are difficult to ascertain because, as Stanley asserted at trial, the El Paso Settlement was comprehensive, and TransAmerican did not allocate any part of the settlement proceeds to any particular element of damages.

"A party who breaks his contract cannot escape liability merely because it is impossible to state or prove a perfect measure of damages." *Southwest Battery Corp. v. Owen*, 131 Tex. 423, 115 S.W.2d 1097, 1099 (1938). Rather, courts distinguish between uncertainty as to the fact of damages, which may preclude recovery, and uncertainty as to the amount of damages, which "will not defeat recovery." *Id.* When the fact of damages is clear, the plaintiff is required to prove his damages with only "reasonable certainty." *E.g., Bildon Farms, Inc. v. Ward County Water Improvement Dist.*, 415 S.W.2d 890, 897 (Tex.1967). This rule of "reasonable certainty" is particularly applicable when it is the wrongdoer's conduct that precludes "precise computation of the extent of the injury." *Kestenbaum v. Falstaff Brewing Corp.*, 514 F.2d 690, 698 (5th Cir. 1975), *cert. denied*, 424 U.S. 943, 96 S.Ct. 1412, 47 L.Ed.2d 349 (1976); *cf. Humble Oil & Ref. Co. v. West*, 508 S.W.2d 812, 818 (Tex.1974) (under confusion of goods theory, party responsible for commingling goods bears burden of establishing aliquot shares with reasonable certainty).

Finkelstein's damages expert, Ricardo Garza, summarized his method of calculating Finkelstein's damages in his written report:

The total value received by [TransAmerican] in January 1990 from El Paso consisted of the following: (1) the value of the El Paso mineral interest was assumed to be equal to $58.0 million; and (2) the additional cash settlement received by El Paso was assumed to be equal to $302.0 million. The following allocation method was used:

Full credit was given to the damages attributable to causes other than repudiation or breach of the 1981 Gas Purchase Agreement, i.e., $67,857,759 of the total damages of $480,309,341 were first charged to the total funds received at settlement, $360.0 million. The remainder was then proportionately allocated in accordance with the judgement [sic] after remittitur attributable to repudiation or breach of the 1981 Gas Purchase Agreement.

The portion attributable to Finkelstein's [overriding royalty interests] for the period 10/1/87 through 12/31/89 of the value received by [TransAmerican] on 1/30/90 under the assumption described above is *$8,247,021* as shown in Column (17) of Page 1 of 3 and Page 2 of 3 of Table 3.[9]

In computing Finkelstein's damages, Garza thus credited TransAmerican with 100% of the take-or-pay damages reflected in the post-remittitur judgment against El Paso, and he used exactly the same method of allocation that Dr. Leitzinger used to calculate TransAmerican's repudiation damages. TransAmerican cross-examined Garza, but it did not introduce any controverting damages evidence.

Under these circumstances, we hold that Finkelstein proved his damages with reasonable certainty, and the evidence is legally and factually sufficient to support the jury's damage finding. We therefore overrule TransAmerican's Points of Error 2–C and 2–D.

### UNJUST ENRICHMENT AND ATTORNEY'S FEES

In Points of Error 1–A through 1–D, TransAmerican argues that the judgment cannot be supported by Finkelstein's unjust enrichment theory. In Points of Error 4–A and 4–B, TransAmerican argues that Finkelstein cannot recover attorney's fees for unjust enrichment and cannot, in any event, recover attorney's fees absent an underlying

---

**9.** Words in all capitals changed to upper and lower case for ease of reading.

recovery. Because we have held that Finkelstein is entitled to recover for TransAmerican's breach of its contractual duty to reasonably market, these points of error are not dispositive of TransAmerican's appeal, and we do not address them. *See* TEX.R.APP. P. 90(a).

### CONCLUSION

TransAmerican effectively received two prices for the La Perla Ranch gas it produced and sold on the spot market between October 1, 1987 and December 31, 1989, but it paid Finkelstein his overriding royalty only on the spot market price. This failure is a breach of TransAmerican's duty to reasonably market Finkelstein's gas. Because Finkelstein proved his damages arising out of this breach with reasonable certainty, the judgment in his favor is affirmed.

### OPINION ON DENIAL OF MOTION FOR REHEARING

RICKHOFF, Justice.

While one could uncover authority for the majority's en banc decision (or indeed almost any result in this complex case), the majority's decision is a most tortured climb over true equity, the express language of the lease, the trial court's faultless rulings and submissions, the admissible evidence and the jury's verdict. Then, at the summit, other courts' reliance on and praise for the original panel's decision comes into view. *See, e.g. Williamson v. Elf Aquitaine, Inc.,* 925 F.Supp. 1163, 1169–70 (N.D.Miss.1996); *Neel v. HECI Exploration Co.,* 1996 WL 426066, at *8–9 (Tex.App.–Austin July 31, 1996, n.w.h.).

Perhaps most notable among these subsequent developments is *Williamson v. Elf Aquitaine, Inc.* In that case, the pipeline settled with the producer/lessee for a single lump sum payment of $6,578,000.00 in exchange for the lessee's agreement to waive any past claims and to decrease the sales price for any future gas purchases. 925 F.Supp. at 1166. In addition, the pipeline's make-up rights were eliminated. *Id.* In reliance on the original panel opinion in the instant case, the court held that "a court's finding that nonrecoupable settlements are indeed royalty-bearing, based on the fact that production has occurred, is consistent with the Texas court's literal interpretations of the lease language." *Id.*

Interestingly, although Chief Judge Senter noted in his opinion in *Williamson* that the issue was a matter of first impression in Mississippi, he praised the analysis of the original panel decision in the instant case and acknowledged that the Mississippi Supreme Court's general policy of adopting Texas law in cases involving previously unaddressed oil and gas issues would be followed. *Id.* at 1167, 1169–70. Evidently, our en banc reversal will distort and disturb the equities in this area of the law beyond this one case and beyond our borders.

In Finkelstein's Motion for Rehearing, he states, simply, that either the language of the lease permits him to recover the royalties, or if the language does not so permit, the issue was properly submitted to the jury under the unjust enrichment theory. Without reason, the majority wrests the case from the jury and renders its own judgment. That judgment should be reheard and reconsidered in light of the approval voiced for the original panel opinion in subsequent cases. *See, e.g. Williamson v. Elf Aquitaine, Inc.,* 925 F.Supp. at 1169–70; *Neel v. HECI Exploration Co.,* 1996 WL 426066, at *8–9.